NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0698n.06

No. 09-3362

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Nov 12, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| JAMES H. STREETS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    SUTTON and McKEAGUE, Circuit Judges; JONKER, District Judge.[*]

**Jonker, District Judge**. The government prosecuted Defendant James Streets for carrying

out a two-year scheme to defraud his employer by diverting customer payments from his employer

to himself.  According to the government, Mr. Streets also made materially false statements to the

investigators handling the case for the Federal Bureau of Investigation.  The matter culminated in

a trial where the jury found Mr. Streets guilty as charged of both mail fraud and making a materially

false statement to the government.  Mr. Streets appealed.  For the reasons given below, we affirm

his sentence and conviction.

---

[*]The Honorable Robert J. Jonker, United States District Judge for the Western District of
Michigan, sitting by designation.

**FACTS**

**I.      Background**

The Putnam companies are a trucking company and several related businesses. In July 2000, Putnam hired Mr. Streets to build and run the new brokerage business, Putnam Logistics. Putnam gave Mr. Streets a great deal of autonomy and discretion in developing and running Putnam Logistics.

Unlike the rest of the Putnam businesses, Putnam Logistics did not use trucks owned or leased by Putnam. Instead, Putnam Logistics arranged shipments for a customer using third-party truckers and trucking companies. After receiving confirmation of delivery, Putnam Logistics would pay the third-party trucker. Putnam Logistics then would invoice the customer whose goods had been transported, and the customer would pay Putnam Logistics for the work. Putnam Logistics made a profit by charging the customer more than it paid the trucker to haul the load.

At the time Putnam Logistics was formed, its billing system used software that prevented it from being integrated with the rest of the Putnam companies. Mr. Streets therefore was primarily responsible for the paperwork, payment systems, and billing systems for Putnam Logistics. Ron Kunkel, an employee of Putnam, provided some oversight over some aspects of Putnam Logistics' billing. He was the only person authorized to write a check on behalf of Putnam Logistics. He also reviewed the monthly sales report, drafted by Mr. Streets, that showed all of Putnam Logistics' shipments, customers, receivables, and payables. In addition, Mr. Kunkel had access to review the paper files related to the trip documents.

Although Mr. Streets could not write a Putnam check without Mr. Kunkel's authorization, Mr. Streets could issue payments in the form of T-Cheks. T-Cheks are a type of money order that can be cashed at truck stops. Moreover, Mr. Streets had the discretion to decide whether to pay a

trucker by T-Chek. He also had the discretion to decide whether to pay only the trucker's advance expenses or the entire trip by T-Chek. The only review Putnam conducted of the T-Cheks was done by the accounting department, which merely reconciled a copy of the T-Chek Mr. Streets wrote against the debits the T-Chek company made against Putnam's account.

While Mr. Streets was managing Putnam Logistics, Mr. Kunkel noticed that some paper files were missing documents or contained only handwritten notations. Mr. Kunkel frequently noticed these types of discrepancies with particular carriers Mr. Streets used to deliver shipments for Hankook Tires, an important customer of Putnam, and almost always when Mr. Streets had paid the trucker by T-Chek. Mr. Kunkel was not particularly concerned about the problems, however, because all of the documents in a file always matched with regard to the type of shipment, who carried the shipment, and the amount that Mr. Streets said the carrier should be paid.

Mr. Streets' authority to pay truckers by T-Chek and his control over Putnam Logistics' billing and payment systems provided him with the vehicle to defraud Putnam. From August 2001 through March 2002, Mr. Streets paid truckers from a Putnam Logistics account but directed the customers to pay himself, through a business named Howard Logistics. Mr. Streets accomplished his scheme by placing in the Putnam Logistics files false invoices. The false invoices were to Hankook Tires in care of Translogistics, a non-existent entity. The invoices Mr. Streets actually sent to Hankook Tires for those same trips, however, directed Hankook Tires to pay Howard Logistics. Mr. Streets then deposited into his own bank account the checks that Hankook Tires paid to Howard Logistics.

After several months of these fraudulent transactions, Putnam Logistics' accounts receivable for the Translogistics/Hankook account began to increase. In January and February 2002, Putnam's vice president and Mr. Kunkel asked Mr. Streets for an explanation of the accounts-receivable

problem.   Mr. Streets told them that Translogistics was in financial trouble and had not been remitting Hankook Tires' payments to Putnam Logistics.  He assured them, however, that another company was planning to buy Translogistics and assume its liabilities.  About a month later, Mr. Streets told them that Translogistics had been sold and that he would re-bill the new company for the amounts due to Putnam Logistics.  Mr. Streets did not re-bill the new company, however, until Putnam's vice president insisted that he do it immediately.  Mr. Streets then had new invoices prepared, but he sent them to a nonexistent address.

In March and April 2002, Putnam purchased a new billing system and integrated Putnam Logistics into the company-wide system. Mr. Streets was very reluctant to come onto the new billing system, which provided Putnam with more oversight over Putnam Logistics.  It also forced Mr. Streets to input complete mailing addresses for each customer instead of the partial addresses he had put in the system for Translogistics.  The complete addresses he entered for Translogistics in the new system were the false addresses that did not exist.

Mr. Streets resigned from Putnam Logistics in May 2002, shortly after Putnam completed the billing change.  After Mr. Streets left Putnam Logistics, Mr. Kunkel attempted to collect the unpaid accounts and discovered that certain customers, including Hankook Tires, had been invoiced to pay Howard Logistics instead of Putnam Logistics.  He also discovered three checks from "Translogistics Services," at a false address, that partially repaid Putnam Logistics for some of the trips.  None of the checks or their paperwork named Mr. Streets, but the checks were written on his account as shown by the account numbers pre-printed on the checks.

Putnam contacted its attorney and the Zanesville Police about its discoveries.  After doing so, Putnam began receiving several letters from Mr. Streets' alleged attorney, "J.S.D. Williard."[1] Those letters offered various and conflicting explanations for the Hankook Tires account and included offers to pay unspecified outstanding bills.  The author of the letters also threatened to sue Putnam for various claims. The author sent letters to claims adjustor Kimberly Morin of the Cincinnati Insurance Company, Putnam's bonding company for employee malfeasance, after Putnam made a claim with the company.  Putnam also received letters that purported to be from Mathews Company to Jim Streets at Putnam Logistics.[2]  Those letters claimed to need copies of outstanding invoices related to discussions allegedly held with Mr. Streets the previous April.  Mr. Streets later admitted that he had written these letters.

In January 2007, FBI Special Agent Drew McGonaghy interviewed Mr. Streets at his home in connection with his investigation of Putnam's complaint against Mr. Streets.  During that interview, Mr. Streets stated that he had not taken any money that did not belong to him.  Several days later, Special Agent McGonaghy and Mr. Streets met to review records related to the case.  On that occasion, Mr. Streets informed Special Agent McGonaghy that he had to double broker the Hankook Tires account after Putnam Logistics lost a load of tires that were shipped to Hankook Tires.  The Hankook Tires transportation manager did not know of any load intended for his company that Putnam lost.  Mr. Streets also explained that he had paid a "portion of the profits" to Putnam Logistics in three checks totaling $13,720, and that he had made the payments under a

---

[1]The letters use an address that Mr. Streets used for his business.  J.S.D. Williard is the name of Mr. Streets' step-son, who is not a lawyer and who denied any knowledge of the letters.

[2]Gretchen Mathews is defendant's step-daughter and lived at the address written on the letter at the time the letter was sent.  She knew nothing about the letter or Mathews Company.

contract between himself and Putnam.  Although he agreed to produce that contract, he never actually produced it.

Special Agent McConaghy questioned Mr. Streets about a specific load delivery in August 2001, where Putnam Logistics paid Towns Transportation to deliver a load to Hankook Tires. Instead of checking his records, Mr. Streets told the agents that he, and not Putnam Logistics, had paid for the delivery.  Mr. Streets admitted receiving payment from Hankook Tires for the trip, and that he had deposited the check into his checking account.

The agents presented Mr. Streets with a similar situation, where a Howard Logistics invoice was sent to MHF Metals, a Putnam Logistics customer.  There, the payment went into Mr. Streets' account but Putnam Logistics paid to transport the goods.  Mr. Streets had no explanation for the discrepancy, but he guessed it was a clerical mistake.  Even after being shown T-Cheks from Putnam Logistics paying the trucker for the MHF Metals load, Mr. Streets claimed that he had personally paid all of the truckers in every case where Howard Logistics sent an invoice.  Mr. Streets had brought records with him, which he showed to the agents, but these records post-dated the time period Mr. Streets was employed at Putnam Logistics.  Mr. Streets agreed to gather records relevant to the correct time period.  He never did produce any records to the agents.

## II.     Mr. Streets' Indictment and Trial

In April 2007, the grand jury indicted Mr. Streets on a charge of mail fraud, in violation of 18 U.S.C. § 1341, and on a charge of making one or more materially false statements, in violation of 18 U.S.C. § 1001(a)(2).  In support of the second count, making a materially false statement, the government specified three separate false statements that it alleged supported the charge. Mr. Streets' trial commenced on April 28, 2008.

An FBI analyst who had reviewed and summarized all of the documents relating to the 76 instances where Hankook Tires had paid Mr. Streets, acting as Howard Logistics, testified at trial.[3] At trial, the analyst demonstrated generally how the brokerage system was supposed to work, how Mr. Streets received payments from customers, and the total amounts of Mr. Streets' fraud scheme. He also testified about how the fraud scheme worked in the context of one particular mailing that was charged in the indictment, which resulted in a Hankook Tires check to Howard Logistics in April, 2002, in the amount of $11,292.58. The documents related to that trip and check were in government exhibits 67 through 76. *See* Appx. Vol. VIII at 1503-04.

In his defense, Mr. Streets asserted that he, not Putnam Logistics, had paid for the deliveries. Thus, according to Mr. Streets, he was entitled to the payments he received from Hankook Tires. As support, Mr. Streets put forward numerous documents, although none of the documents were originals. Many of the documents were not dated, other than dates that Mr. Streets had subsequently added prior to trial. Only a few bills from truckers were included in the documents, and there were no checks or T-Cheks that matched the amount, date, and trucker involved in any of the 76 charged trips.

As additional evidence that Mr. Streets, not Putnam Logistics, had personally paid some of the truckers for the Hankook Tires trips, Mr. Streets introduced checks drawn on his personal account that were written to "SLC." Mr. Streets testified that he knew from professional experience

---

[3]The summary stated that: (1) the payments Mr. Streets received totaled $96,554.19; (2) each of the 13 checks were deposited into Mr. Streets' bank account; and (3) Mr. Streets had paid back to Putnam Logistics $13,720 in three checks that were made to appear to come from the non-existent Translogistics, but that had actually been drawn on Mr. Streets' account. The FBI analyst also reviewed and summarized all of the documents showing that Putnam Logistics was billed and paid the truckers, at a minimum, $67,747 for those 76 trips.

that SLC is a factoring company.[4]  He attempted to link his payments to SLC to some shipments for which Hankook Tires paid him instead of Putnam Logistics, and he testified that his payments to SLC were evidence that he, not Putnam Logistics, had paid for the trips.  Mr. Streets later admitted at trial, however, that SLC actually is the Student Loan Commission and that he had written the checks to pay his own student loans.

The jury found Mr. Streets guilty on both counts.  On the jury verdict form, the jury answered interrogatories as to each of the three false statements alleged in Count Two and found that all three statements violated the statute.  The district court then held sentencing hearings in November 2008, January 2009, and March 2009.  It sentenced Mr. Streets to 41 months imprisonment on each count to run concurrently and three years of supervised release.  It also ordered Mr. Streets to pay $212,145.60 in restitution.  The written judgment on that sentence was filed March 25, 2009.  Mr. Streets timely appealed.

## ANALYSIS

Mr. Streets presents six issues on appeal.  He contends (1) that his counsel was ineffective; (2) that there is insufficient evidence to support his convictions for mail fraud and making a false statement; (3) that the district court erred in denying his motion for a mistrial related to juror misconduct; (4) that the district court erred in applying certain sentencing enhancements to him; (5) that the district court committed plain error when it failed to declare a mistrial because the jury did not timely receive all of the exhibits; and (6) that the district court erred in including certain activities in his relevant conduct for the purpose of sentencing.  None of Mr. Streets' contentions are well taken.  For the reasons given below, the judgment of the district court must be affirmed.

---

[4]A factor or factoring company is a company that provides an advance to a trucker and then collects from persons who hire the trucker payments that are made to the trucker.

**I.       Ineffective Assistance of Counsel**

For a court to reverse a conviction on the basis that it was the result of ineffective assistance of counsel, "it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable." *Hall v. Vasbinder*, 563 F.3d 222, 237 (6th Cir. 2009). To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted). Accordingly, the court must be able to determine whether the actions taken by counsel were unprofessional or, instead, the result of "sound strategic motive." *See United States v. Bradley*, 400 F.3d 459, 462 (6th Cir. 2005).

In "most direct appeals, however, the record contains scant information regarding the preparation of [the defendant's] trial counsel or his communications with [the defendant]." *Id.* at 461-62. This is because the trial record customarily is devoted to issues of guilt or innocence, not the facts necessary to decide whether trial counsel was effective. *See id.* In the usual case, the appellate court will "have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." *Id.* (internal quotation marks omitted). Accordingly, a motion brought under 28 U.S.C. § 2255 "is preferable to direct appeal for deciding claims of ineffective-assistance." *Id.* at 462 (quoting *Massaro v. United States*, 538 U.S. 500, 504 (2003)). Unless "the record is adequate to assess the merits of defendant's allegations," a court on direct appeal should decline to address the defendant's claim of ineffective assistance. *Id.*

Mr. Streets' claim of ineffective assistance of counsel relies on facts outside the record and is not ripe for decision on this direct appeal. Mr. Streets' complaints can be grouped into categories:

his counsel failed to call witnesses that could have corroborated Mr. Streets' allegations; his counsel failed to properly investigate or prepare the case to the extent necessary to present an effective defense; his counsel failed to gather additional evidence that would have corroborated Mr. Streets' allegations; his counsel failed to adequately inquire of the venire during jury selection; his counsel failed to challenge certain evidence presented by the government; and his counsel failed to request a mistrial when it was discovered that the jury had deliberated without being in possession of all exhibits. Each of these allegations supposes a fact that is not in the record or requires examination of counsel's strategy and motivation for choosing a particular course. *See id.* Because the Court cannot tell from this record whether trial counsel was ineffective or following sound strategy, it should "leave this issue to be decided in the first instance in post-conviction proceedings." *Id.*

## II.     Sufficiency of the Evidence

When a defendant attacks his conviction as being supported by insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Viewing the evidence in this light, a rational trier of fact could have found each essential element of the offenses beyond a reasonable doubt. *See id.*

### A.     Mail Fraud

Mail fraud under 18 U.S.C. § 1341 involves three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Crossley*, 224 F.3d 847, 857 (6th Cir. 2000) (internal quotation marks omitted).

This record contains evidence that Mr. Streets caused Putnam Logistics to pay the costs of certain trips while Mr. Streets, doing business as Howard Logistics, received payment from the customer for the same trip. The evidence of the fraud scheme included (1) more than $67,000 in payments by Putnam Logistics for the 76 trips at issue; (2) invoices that Mr. Streets mailed to Hankook Tires directing it to pay Howard Logistics instead of Putnam Logistics for those same trips; (3) evidence of dummy-accounts-receivable entries on Putnam's books to cover up the fraud; (4) evidence that Mr. Streets deposited Hankook Tires' checks in his personal account; and (5) evidence that Mr. Streets wrote letters and undertook other sloppy activities after-the-fact in an effort to cover his tracks. This evidence alone, taken in the light most favorable to the government, is sufficient to establish beyond a reasonable doubt the three elements of mail fraud. *See id.*

### B.        Making False Statements

Making a false statement under 18 U.S.C. § 1001(a)(2) involves five elements: "(1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of such statement; (4) relevance of such statement to the functioning of a federal department or agency; and (5) that the false statement was material." *United States v. Hixon*, 987 F.2d 1261, 1266 (6th Cir. 1993). The indictment identifies three separate false statements, and the jury (on special interrogatories) found Mr. Streets guilty with regard to each of the three statements.

In the first statement, Mr. Streets claimed to have a contract with Putnam to continue his own business as a broker. Mr. Streets contends that this statement was not material. Materiality under section 1001 is a question of law. *United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir. 1985). A statement is material when it has the natural tendency to influence, even if it did not actually influence the government agent. *Id.* at 1151. In fact, a statement can meet the materiality

requirement even if the government agent knows that the statement is false. *United States v. LeMaster*, 54 F.3d 1224, 1230-31 (6th Cir. 1995).

This statement was material. *See id.*; *Chandler*, 752 F.2d at 1151. The government introduced evidence at trial that Putnam had no knowledge that Mr. Streets was doing business as Howard Logistics while he was starting and running Putnam Logistics. It further put forward evidence that Mr. Streets never would have been hired by Putnam if Putnam had known that he was running a competing business. Mr. Streets received the Hankook Tires' payments in the name of Howard Logistics; at trial he stated he was co-brokering some of the loads with Putnam. Accordingly, the existence of such a broker's contract would tend to show that Putnam was aware that Streets operated a similar logistics business and that the company allowed him to broker loads for himself, despite working for Putnam Logistics. Mr. Streets' statement that he had such a contract would tend to influence the investigation into whether Mr. Streets had an intent to defraud his employer. The statement accordingly was material to the investigation. *See id.*

When the FBI confronted him with documents for a specific trip chosen at random, "Trip 2123," Mr. Streets made his second false statement, which was that he, not Putnam Logistics, had paid the trucker for the loan invoiced on Putnam invoice #1097 and Howard Logistics invoice #1047. Mr. Streets then followed up with his third false statement when he stated that he himself had paid all of the independent drivers for the loads that were brokered through Howard Logistics and that he had records to show it. Mr. Streets contends that there was insufficient evidence from which the jury could conclude that he made either of these statements knowingly and willfully. His contention is without merit.

Mr. Streets made both of these statements in a second FBI interview that was scheduled to give Mr. Streets an opportunity to present his records to support his version of events and to review

specific Putnam records. The evidence was such that a jury could conclude, based on the circumstances and timing of the interview, that Mr. Streets was not merely mistaken when he stated without hesitation or qualification that he had paid for a particular trip and that he had paid for all of the trips. Mr. Streets declined to qualify his statement even when given the opportunity to review the records and evidence against him. He also failed to produce records that supported his statements, despite his promise to do so. The lack of such records supports the jury's conclusion that Mr. Streets was not merely mistaken, but he in fact had no reason to believe that he paid the truckers. Accordingly, there was sufficient evidence from which a jury could conclude that these two statements violated section 1001.

The jury needed to properly convict Mr. Streets of making only one false statement to uphold the conviction on this count. *See United States v. Dedman*, 527 F.3d 577, 598 (6th Cir. 2008) ("[W]e uphold a conviction where there was sufficient evidence for at least one of the alleged false statements."). Here, however, there was sufficient evidence from which the jury could conclude that Mr. Streets made all three statements. Accordingly, we must affirm Mr. Streets' conviction under section 1001.

## III.    Juror Misconduct

During the second day of trial, government counsel informed the courtroom deputy, Jennifer Kacsor, of two possible incidents of juror misconduct that had been brought to counsel's attention. First, Mike Gipson, a court security officer, had overhead a juror talking on the phone and complaining that she was chosen as a juror. Second, Gretchen Mathews, a government witness and Mr. Streets' step-daughter, heard a juror, again speaking on a cell phone, say that "the defense was doing horrible." The trial court brought the jurors into the courtroom one at a time, but did not inform them why. Mr. Gipson and Ms. Mathews were in the courtroom when each juror was

brought in.    Separately, they each identified juror number eight as the juror involved in both

incidents.

Defense counsel moved for a mistrial once Mr. Gipson and Ms. Mathews testified under oath

about what they had observed.  In the alternative, defense counsel asked the court to question the

juror involved.  Government counsel opposed the motion for a mistrial, claiming that the court did

not have any indication that the other jurors had overheard or were involved in the incidents.

Government counsel suggested that the court excuse the juror and seat an alternate as the most

appropriate remedy.

When questioned under oath by the court, juror number eight acknowledged the first incident,

when she complained of being chosen as a juror.  She denied making any substantive comments

about the case, however, and she stated she had not formed an opinion as to Mr. Streets' guilt or

innocence.  She also denied that she had discussed the trial with anyone.  She further denied listening

to the proceedings while in the jury room, after the court heard from Mr. Gipson that he had found

the juror alone near the door to the courtroom when he went to get her to testify.  After hearing the

testimony, the district court removed the juror and seated an alternate, at the request of both parties.

Neither party asked for any further relief, including a declaration of a mistrial, at that time.  Finally,

the court questioned each remaining juror individually.  All of the remaining jurors denied

overhearing any other juror discussing the case at any time or discussing the case with anyone else.

Each juror also denied having formed an opinion regarding Mr. Streets' guilt or innocence.

The district court's decision not to grant a mistrial is reviewed under the abuse of discretion

standard.  *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008).  "We apply the

abuse-of-discretion standard in jury-misconduct cases precisely because the trial judge is in the best

position to determine the nature of the alleged jury misconduct, and to determine appropriate remedies for any demonstrated misconduct." *Id.* (alterations and internal quotation marks omitted).

"The starting point for discussion of trial court treatment of extraneous contact with a jury is *Remmer v. United States*, 347 U.S. 227 (1954)." *White v. Smith*, 984 F.2d 163, 165 (6th Cir. 1993). Under *Remmer*, if the communication to a juror comes from an outsider and suggests bribery, the district court must hold a hearing to determine whether the defendant was prejudiced by the statement. *See id.* at 166. Only such extreme communications are "deemed presumptively prejudicial." *Id.* (quoting *Remmer*, 347 U.S. at 229-30). Indeed, not all communications with jurors even "warrant a hearing for a determination of potential bias." *Id.* A brief communication between a juror and a judge, for example, may not require an evidentiary hearing, let alone a presumption of prejudice. *See id.*

Here, there was no indication that an outsider communicated with a juror for the purpose of bribing the juror. Instead, a witness for the government overhead a juror talking on a phone and telling the person on the other end of the line that the defense was doing a terrible job. Although the situation did not fall squarely within *Remmer*, the district court nevertheless conducted a hearing with the consent and involvement of both parties to determine whether any misconduct had occurred. *See id.* At that hearing, the juror denied making the statement or being in the area where the statement was overheard. She further denied having formed an opinion about the case. The district court noted that the juror's phone call and discussion of the trial had not been clearly proven, but the district court nevertheless excused her from jury service and seated an alternate juror. Both parties consented to this solution. The district court then questioned individually the other jurors, and each of them denied hearing the juror's discussion of the case. The individual who had witnessed the phone call also stated that no one else was around to overhear the juror's statements. The district

court concluded that the rest of the jury was not tainted and moved forward with the trial. *See id.*

By dismissing the only juror who might have been subject to extraneous prejudicial information, the

district court eliminated any possible influence on the other jurors and negated any possible prejudice

to Mr. Streets. *Id.* The district court did not abuse its discretion when it did not grant a mistrial for

possible juror misconduct. *See Wheaton*, 517 F.3d at 361.

## IV.      The Late Delivery of Two Government Exhibits to the Jury

Closing arguments took place on the morning of May 6, 2008. During the government's

closing, counsel referenced numerous exhibits, including the GX 77 series and GX 79.13. These

exhibits, however, were not delivered to the jury when they left for deliberations around noon.

Government counsel realized the error and informed the court and defense counsel, and the exhibits

were delivered to the jury before it returned its verdict.

Although the missing exhibits were delivered to the jury prior to its returning a verdict, it is

unclear from the record how much time the jury had the exhibits before they returned a verdict. The

record does not indicate when the court sent the exhibits to the jury. The court held a conference

with all parties at 2:33 pm the same day regarding the exhibits. At that time, all parties knew the jury

had notified chambers that it had reached a verdict. In total, the jury deliberated less than three

hours. The district court made a record of the matter, and defense counsel did not move for any

relief regarding the exhibits or the timing of their delivery to the jury. The court then brought the

jury into the courtroom for return of the verdict.

Mr. Streets argues that the district court erred when it failed to declare a mistrial or take other

action when it discovered that the jury had not promptly received all of the exhibits admitted at trial.

Because Mr. Streets first raises this argument on appeal, we apply the plain error standard. *See*

*United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006). To establish plain error, a defendant must

show (1) that an error occurred in the district court; (2) that the error was obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this error seriously affected "the fairness, integrity or public reputation of the judicial proceedings." *United States v. Abboud*, 438 F.3d 554, 583 (6th Cir. 2006) (quoting *United States v. Wright*, 343 F.3d 849, 861 (6th Cir. 2003)).

During the trial, the government used the GX 77 series of exhibits as part of its proof of Mr. Streets' fraud. The exhibits were copies of three checks that appeared to be from Translogistics, a non-existent company at a non-existent address, but were really disguised payments from Mr. Streets' personal checking account. During closing arguments, the government used those same exhibits and inadvertently failed to return them to the box with the other exhibits delivered to the jury. As soon as the government realized the mistake, it notified the court and defense counsel. The court delivered the exhibits to the jury before the jury returned its verdict. Mr. Streets' counsel did not move for a mistrial or request other relief related to the untimely delivery of the exhibits.

Mr. Streets contends that the absence of the exhibits affected his substantial rights and constituted plain error because the exhibits went to the core of the issue of whether he had made a false statement. Specifically, he contends that the exhibit shows that he did pay for the load invoiced on Putnam invoice #1097 and Howard Logistics invoice #1047. As an initial matter, Mr. Streets offers no authority in support of his contention that the district court plainly erred by delivering the missing exhibits to the jury without taking additional corrective action. The record reflects that the exhibits were given to the jury as soon as they were discovered and before the jury returned its verdict. Moreover, the jury was able to consider, observe, and evaluate the exhibits in question during the testimony of Ron Kunkel and during the government's closing argument. Each page of the exhibit was displayed on the overhead projector and discussed during the trial. Accordingly, the Court should be satisfied on this record that the error in question did not have any influencing effect

upon the jury.[5]  Accordingly, it was not plain error to deliver the exhibits to the jury without

additional remedy.  *See id.*

Additionally, the testimony at trial established that Mr. Streets' repayment to Putnam

Logistics in those three checks was less than Putnam Logistics paid for the trips related to the checks.

The FBI analyst testified at trial that the amount received by Putnam Logistics in those three checks,

$13,720, was $11,210 less than Putnam Logistics had invoiced for those trips.  The exhibits did not,

on their own, establish that Mr. Streets had not made a false statement when he stated that he paid

the trucker for those trips.  Moreover, as discussed above, the jury needed to find Mr. Streets guilty

of only one of the false statements to properly convict him of Count II.  *See Dedman*, 527 F.3d at

598.  Accordingly, Mr. Streets has not established that the mistake in late delivering the exhibits was

a plain error that affected his substantial rights or seriously affected "the fairness, integrity or public

reputation of the judicial proceedings." *See Abboud*, 438 F.3d at 583.

## V.     Sentencing Enhancements for Abuse of a Position of Trust and Obstruction of Justice

### A.     Abuse of a Position of Trust

On appeal, the Court reviews de novo the district court's determination that a defendant

"occupied a position of trust for the purpose of the Sentencing Guidelines." *United States v. May*,

568 F.3d 597, 602 (6th Cir. 2009) (quotation omitted).  Under section 3B1.3, the offense level

increases by two points if the defendant abused a position of public or private trust, or used a special

skill, in a manner that significantly facilitated the commission or concealment of the offense.

"Section 3B1.3 of the Guidelines instructs that the term 'public or private trust' is 'characterized by

---

[5]Courts have found any error to be harmless when exhibits that had not been admitted were delivered to the jury.  *See United States v. Bentley*, 489 F.3d 360, 363 (D.C. Cir. 2007); *United States v. Bishop*, 492 F.2d 1361, 1366 (8th Cir. 1974).

professional or managerial discretion.'" *Id.* at 602-03 (quoting U.S.S.G. § 3B1.3 n.1). Individuals in a position of professional or managerial discretion "are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* at 603 (quotation omitted). A district court should apply the enhancement only "if the position of trust contributed in some significant way to facilitating the commission or concealment of the offense." *Id.* (alteration and internal quotation marks omitted). Although "the enhancement would be proper as to a bank executive's fraudulent loan scheme, it would not be appropriate in the case of an embezzlement or theft by an ordinary bank teller." *Id.* (internal quotation marks omitted). Additionally, "the level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position." *Id.* (alteration and quotation omitted). The term trust as used in the Guidelines is a term of art, not the ordinary dictionary concept of trust. *Id.*

The district court properly concluded that Mr. Streets had abused a position of trust. Mr. Streets' duties and position at Putnam Logistics gave him wide managerial discretion, and he used that discretion to facilitate his fraud scheme. *See id.* He was subject to significantly less supervision than a standard employee. *See id.* Mr. Streets was brought to Putnam Logistics to start a logistics business from the ground up, and he was hired because he appeared to have substantial experience in operating a logistics business. Indeed, Putnam hired and placed Mr. Streets in his position because of Mr. Streets' presumed better judgment in developing and managing Putnam Logistics. In his position, he held operational discretion to set up virtually every aspect of the business, including developing and maintaining the methods of record-keeping that would be used to double check his work. Moreover, he had independent authority to locate and select customers, trips, and truckers; to invoice customers; and to pay truckers. He even held discretion to determine

whether to pay truckers by check, which involved other departments at Putnam, or to pay by T-Chek, which required only his own authorization. Mr. Streets used the discretion and independence of his position to direct customers to pay him instead of Putnam and to have Putnam Logistics pay the truckers for those same trips by T-Chek, a method of payment that involved no oversight and was difficult to trace. Furthermore, he used his position to lay false trails in the paperwork, including false invoices, false addresses of alleged customers, and partial payments that he made to appear to come from false sources. Mr. Streets' actions are more akin to an attorney stealing his client's funds or a "bank executive's fraudulent loan scheme" than to "theft by an ordinary bank teller or hotel clerk." *See* U.S.S.G. § 3B1.3 n.1. Because Mr. Streets used his managerial discretion and independence to defraud his employer, the district court did not err in concluding that Mr. Streets occupied and abused a position of trust. *See id.*; *May*, 568 F.3d at 603.

Mr. Streets' reliance on *United States v. Tatum*, 518 F.3d 369 (6th Cir. 2008), does not change this outcome. *Tatum* involved a simple embezzlement by an office manager. *Id.* at 370. Although Ms. Tatum's duties included preparing checks to pay company bills, she had no authority to decide whether or not to issue a check. *Id.* Indeed, she did not even have authority to sign a check once the company decided the check should be issued. *Id.* Unlike Mr. Streets, Ms. Tatum was not given any discretion to use her judgment over the finances of the company, to select customers, to set the rate at which clients would be charged, to set the rate at which services would be paid, or to authorize payments. *See id.* at 373. Additionally, she was closely supervised. *See id.* Accordingly, Ms. Tatum's employer did not "intentionally make[] himself or itself vulnerable" to her or cede to her "presumed better judgment" by giving her "control over [its] affairs." *See id.* Putnam, by contrast, made itself vulnerable to Mr. Streets by ceding to his judgment control over its affairs.

Accordingly, the district court properly assessed to Mr. Streets two points for abuse of a position of trust.  *See id.*

### B.      Obstruction of Justice

A deferential standard of review is appropriate in reviewing applications of the sentencing enhancement for obstruction of justice.  *United States v. Jackson-Randolph*, 282 F.3d 369, 389 (6th Cir. 2002).  Accordingly, "the clear error standard is . . . appropriate for reviewing sentencing decisions under § 3C1.1 where the sole issue before the district court is a fact-bound application of the guideline provisions."  *Id.* at 390.  This adjustment applies if the defendant obstructed "the investigation, prosecution, or sentencing" of the offense of his conviction.  U.S.S.G. § 3C1.1 n.1.  Although the "provision is not intended to punish a defendant for the exercise of a constitutional right," such as a defendant's general "denial of guilt," it is appropriately applied to "a denial of guilt under oath that constitutes perjury."  U.S.S.G. § 3C1.1 n.2 & n.4(b).  "In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  U.S.S.G. § 3C1.1 n.2.

The presentence investigation report recommended applying to Mr. Streets the two-point enhancement for obstruction of justice based on his perjury and his producing false, altered or counterfeit documents during the trial.  The district court applied the enhancement only for Mr. Streets' perjury, based on his statement at trial that SLC is a factoring business and that his four checks in the total amount of $3,500 to SLC were payments for truckers.  In support of his assertion that SLC is a factor, Mr. Streets pointed to three bills of lading with the handwritten notation SLC. By contrast, other instances of his paying a factor involved invoices that had printed clearly on them

a factor stamp.  The invoice related to the three bills of lading had on it neither a factor stamp nor

the notation SLC.  Mr. Streets did not provide any documents in support of the fourth SLC check,

which was dated six months after Mr. Streets' employment with Putnam Logistics ended.  On cross-

examination, government counsel confronted Mr. Streets with documentation from Citibank of

South Dakota, which proved that the checks Mr. Streets wrote to SLC were made to the Student

Loan Commission and not to a factoring company.  Mr. Streets admitted that he recognized the

checks made to SLC to be student loan payments actually made to the Student Loan Commission.

He then admitted that the checks he wrote to SLC were not to pay a trucker for a trip.  The district

court did not clearly err when it concluded that these statements amounted to perjury and applied the

enhancement under section 3C1.1.  *See Jackson-Randolph*, 282 F.3d at 389; U.S.S.G. § 3C1.1 n.2

& n.4(b).

Mr. Streets' contention that his statements were merely inaccurate or the result of confusion,

mistake, or faulty memory is unavailing.  The district court acknowledged that mere mistakes and

confusion do not necessarily reflect a willful attempt to obstruct justice, but it nevertheless concluded

that Mr. Streets had obstructed justice by committing perjury.  Mr. Streets testified on direct

examination that he was familiar with factor companies in the trucking business in general and with

a factoring company called SLC in particular.  His affirmative statement that SLC is a factor supports

the conclusion that his statements were not merely mistakes of recollection, as does the fact that no

such factor company exists.  This is shown, too, by the fact that all other factoring companies at issue

were clearly identified on an invoice by a rubber stamp with their name, position as a factor, and

directions for payment, not by a handwritten notation of an acronym on a bill of lading.

Additionally, the checks to SLC were written on his personal account, unlike other checks he paid

to truckers that were written on the Howard Logistics checking account.  And at least one of the

checks stated on its memorandum line that the check was for "Principal Only," which indicates it is a loan payment and not a payment to a trucker. From these facts, the district court did not clearly err when it concluded that Mr. Streets' statements were perjury and a deliberate attempt to mislead the jury and convince them that Mr. Streets had paid the truckers when he had not done so.

**VI.     The District Court's Determination of Relevant Conduct and Restitution**

The district court held three sentencing hearings over the course of four months. The government put forth Ron Kunkel, Putnam Logistics' financial officer, as well as a spread sheet summary and two notebooks of documents, as evidence of relevant conduct and restitution amounts. The government originally claimed $221,919.27 in restitution, but later reduced the figure to $212,145.60 to avoid a potential double-counting issue. The court treated as relevant conduct some incidents not presented at trial. The relevant conduct included additional payments by Hankook Tires to Mr. Streets, similar fraud with other customers besides Hankook Tires, T-Cheks and loading fees paid to truckers for which Putnam Logistics did not have any paperwork, payments Putnam Logistics made to Mr. Streets for a tractor trailer leased by him, and checks Mr. Streets wrote to himself using the alias James Callahan, his first name and wife's last name.

In determining Mr. Streets' total offense level, the district court found the total loss attributable to Mr. Streets to be $221,745.60. That finding resulted in adding twelve levels to Mr. Streets' base offense level. We review a district court's findings of fact as to relevant conduct, loss, and restitution for clear error. *See United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004); *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998). "[W]hether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed de novo by this court." *Rothwell*, 387 F.3d at 582. Additionally, we review

de novo the district court's interpretation of the Sentencing Guidelines. *United States v. Williams*, 411 F.3d 675, 677 (6th Cir. 2005).

A.      **The Categories of Loss the District Court Included in Mr. Streets' Relevant Conduct**

Mr. Streets first contends that the district court impermissibly attributed to him losses that were not found by the jury at trial.  He contends that this inclusion of losses violated his constitutional rights.  His contention is without merit. *See, e.g.*, *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc).  As long as the defendant "receives a sentence at or below the statutory ceiling set by the jury's verdict," the district court does not abridge the defendant's rights by looking to other facts when "selecting a sentence within that statutory range." *Id.*

Mr. Streets next contends that certain items of uncharged relevant conduct relate to transactions outside the scope of the conduct established during trial.  He contends that the district court impermissibly considered them as part of his relevant conduct.  He objects that certain items were outside of the time frame established at trial and that other items were related to customers other than Hankook Tires, the customer discussed at trial.  This contention, too, is without merit.

Conduct may be considered as part of the relevant conduct even if it is outside the specific charge in the indictment or does not constitute a federal offense. *United States v. Klups*, 514 F.3d 532, 537-38 (6th Cir. 2008).  Under the Federal Sentencing Guidelines, relevant conduct includes "all acts and omissions [committed by the defendant] that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).  "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § lB1.3 cmt. 9(A).  Furthermore, "[o]ffenses that do

not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § lB1.3 cmt. 9(B). In determining whether offenses constitute the same course of conduct, the court may consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.*

Mr. Streets objects to the inclusion in his relevant conduct of amounts paid to non-Hankook Tires customers, amounts paid to cover services in connection with Hankook Tires shipments but for which there was no Putnam Logistics paperwork, payments Mr. Streets made by T-Chek to truckers for services unrelated to any Putnam Logistics load, and payments Mr. Streets made to himself under an alias as a commission for shipments he actually credited to Putnam Logistics. These payments were carried out by the same mechanism as the fraud involving Hankook Tires. For each, Mr. Streets used his position at Putnam Logistics to cause Putnam Logistics to pay for services while he reaped the rewards. In some instances, he used bills from Howard Logistics to the customer to cover his tracks. In others, he used Putnam Logistics' T-Checks and left no paper trail whatsoever at Putnam Logistics. In each case, however, the victim was the same and the basic methods and time frames were the same. The conduct therefore was substantially connected by at least several common factors, including the same victim, purpose, and modus operandi. *See* U.S.S.G. § lB1.3 cmt. 9(A). Additionally, the offenses constituted the same course of conduct because of the degree of similarity of the offenses and the time interval between the offenses. U.S.S.G. § lB1.3 cmt. 9(B). The district court did not err in including these offenses in Mr. Streets' relevant conduct. *See id.*; *Klups*, 514 F.3d at 537-38.

B.      **Determination of the Total Amount of Loss for Purposes of Relevant Conduct**
        **or Restitution**

On appeal, Mr. Streets challenges for the first time some of the particular amounts the district

court included in its total loss calculation. Although he filed objections to the presentence

investigation report regarding the categories of losses included in relevant conduct, he did not

specifically challenge at any stage of sentencing the amounts, the trips included or other items

constituting the total for each category of loss. Because Mr. Streets is raising this factual challenge

for the first time on appeal, the Court should review his objections only for plain error. *See Baker*,

458 F.3d at 517.

Here, Mr. Streets simply asserts, without support, that the government has double-counted

certain amounts and that the information lacked sufficient indicia of reliability to support the

probable accuracy of it for the purposes of relevant conduct. This contention is without merit. The

presentence investigation report and the government's sentencing memoranda detailed the loss

amounts. For Mr. Streets to challenge the detailed factual allegations in the presentence

investigation report, he was required to do more than just object to them. *United States v. Duckro*,

466 F.3d 438, 449 (6th Cir. 2006). Indeed, he must produce evidence to call those facts into

question. *Id.* "When a defendant fails to produce any evidence to contradict the facts set forth in

the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United*

*States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007). Even now, Mr. Streets does not produce

evidence to contradict the district court's conclusions. Instead, he merely asserts on appeal that the

numbers are incorrect and unsupported. Accordingly, the district court did not clearly err in

determining the particular amounts of loss attributable to Mr. Streets. *See id.*

**CONCLUSION**

For the foregoing reasons, the Court **AFFIRMS** Mr. Streets' conviction and sentence.