NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0103n.06

Case Nos. 16-4261, 16-4267, 16-4271, 16-4287

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 01, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| v. | ) | OHIO |
| | ) | |
| DARYL DANE DONOHUE (16-4261); | ) | |
| WILLIAM SCHURECK (16-4267); | ) | |
| KENNETH JACKSON (16-4271); DENNIS | ) | |
| DECIANCIO (16-4287), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

OPINION OF THE COURT

BEFORE: DAUGHTREY, McKEAGUE, and BUSH, Circuit Judges.

**McKEAGUE, Circuit Judge.** These four consolidated appeals stem from judgments on jury verdicts finding all four defendants guilty of numerous charges relating to an investment fraud scheme. The scheme revolved around development of a hypodermic syringe destruction device called the "Sharps Terminator." The jury found that defendants had made material misrepresentations and omitted material facts in soliciting funding for development of the product. Defendants were sentenced to various terms of imprisonment and ordered to pay restitution to the victims in the total amount of nearly $10 million. On appeal, defendants assert

- 1 -

various claims of error that raise several common themes. None has been shown to merit relief. We therefore affirm all four judgments.

## I. BACKGROUND

In August 1992, defendant Kenneth Jackson was convicted in Ohio state court of multiple counts of unlicensed sales of securities and sales of unregistered securities, passing bad checks, perjury, theft and aggravated theft. The convictions stemmed from Jackson's operation of what the government has characterized as a $13 million Ponzi scheme involving sales of securities in "Vision Television Network." As a consequence, Jackson was incarcerated from 1992 to 1999.[1] He was also prohibited, by injunction of the Securities and Exchange Commission ("SEC"), from holding any corporate officer or director position in a publicly traded company. Jackson was also subject to a disgorgement order requiring him to pay $1.8 million to the SEC.

Despite these setbacks, in 2002, Jackson had become director of research and development for Event Future (a/k/a E-Med), a company he and co-defendant Daryl Dane Donohue established to design and manufacture a hypodermic needle destruction device called "Needlezap." The Needlezap disposes of used needles by crushing them. It is a Class III medical device requiring Food & Drug Administration ("FDA") approval before marketing. Donohue was employed by E-Med to address the FDA's regulatory compliance requirements. The Needlezap was granted FDA approval in 2003 and was patented in 2006.

In 2007, Jackson left E-Med and he and co-defendant William Schureck created Medical Safety Solutions ("MSS") to develop and market an improved version of the Needlezap called the "Sharps Terminator." The Sharps Terminator was designed to dispose of used needles by

---

[1] During his imprisonment, Jackson became acquainted with at least two individuals who would later become associated with him as employees in the design and manufacturing operations at the center of the instant prosecution.

incinerating them. Again, FDA premarket approval was required. Donohue was hired by MSS as a regulatory compliance consultant, but Jackson, director of research and development, was responsible for obtaining FDA approval of the Sharps Terminator. Schureck was Chief Executive Officer of MSS.

To raise funds for development of the Sharps Terminator by selling securities, MSS prepared two prospectuses, "Prospectus A" (2007) and "Prospectus B" (2009). Prospectus A disclosed an Assets Purchase Agreement under which MSS agreed to pay Jackson and Schur Partnership (a venture established by Schureck) $3 million for transfer of ownership of the Sharps Terminator, along with its patent and intellectual property rights. What the prospectuses did not include, relevantly, was any mention of MSS co-founder Jackson's prior convictions for theft and securities fraud offenses. Nor did the prospectuses disclose that the conduct for which Jackson was convicted also precipitated action by the SEC that resulted in a $1.8 million judgment against him, as well as an injunction prohibiting him from holding any officer or director position in a publicly traded company.

In the summer of 2007, MSS began displaying its plans for the Sharps Terminator and soliciting investments at medical trade shows. MSS raised $5 million from investors in response to Prospectus A. Among the first such investors, co-defendant Dennis DeCiancio invested $275,000 and became a promoter of the Sharps Terminator at trade shows. Of the $5 million received, $3 million was to be used to pay for the intellectual property rights in the Sharps Terminator and to repay prior investors in the Needlezap, and $2 million was to be used for further research and development of the Sharps Terminator.

In July 2007, MSS also purportedly commenced efforts to obtain FDA premarket approval and told inquiring investors for years that progress was slow, but approval was

imminent. In fact, Jackson testified, it was not until October 2012 that he first filed the application for premarket approval. The FDA responded to the application a month later with the first of several deficiency letters, which MSS was attempting to address when, in March 2013, its efforts were undercut by execution of a search warrant and seizure of MSS files and records. In the meantime, the FBI had begun investigating MSS's operations.[2]

The investigation ripened into an 80-page, 31-count indictment in the Northern District of Ohio in July 2015, charging all four of the above-named defendants—Jackson, Donohue, Schureck and DeCiancio—with numerous offenses allegedly committed between November 2007 and May 2013, including conspiracy, mail fraud, wire fraud, securities fraud, and money laundering. The charges were premised on allegations that defendants, in soliciting investments for development and marketing of the Sharps Terminator device: falsely represented the status of FDA premarket approval proceedings, the market-readiness of the Sharps Terminator, and the use to which invested funds would be applied; and failed to disclose material information to prospective investors about Jackson's prior convictions.

A joint jury trial was conducted in April and May 2016 and culminated in verdicts on May 6, 2016, finding all four defendants guilty of almost all charged offenses. All four defendants were sentenced on October 25, 2016, to various prison terms: Jackson to 188 months, Schureck to 108 months, DeCiancio to 70 months, and Donohue to 46 months. The judgments of sentence were entered on November 1, 2016, and each defendant timely filed notice of appeal. The judgments were followed by a restitution order on January 5, 2017,

---

[2] In May 2013, MSS entered into a license agreement whereby its rights to the Sharps Terminator were sold to Sharps Terminator, LLC, in exchange for payment of one-third of net profits from sales of the Sharps Terminator. The FDA approved the Sharps Terminator for manufacture and sale in the United States in February 2016 and a patent was issued in March 2016.

ordering all four defendants, jointly and severally, to pay restitution in the amount of $9,825,917.41. Amended judgments, incorporating all terms and conditions of the sentences, were entered on February 6, 2017. None of the defendants filed notice of appeal from his amended judgment.

On appeal, defendants challenge: the district court's denial of Jackson's pretrial motion in limine (to exclude evidence of his prior convictions), the sufficiency of the evidence to support the verdicts, and the sentences imposed as procedurally and substantively unreasonable. None of the claims presents reversible error.

## II. JURISDICTION

There is no dispute that the court has jurisdiction to decide defendants' challenges to their original judgments, which represent final appealable judgments under 18 U.S.C. § 3742(a) (final sentence) and 28 U.S.C. § 1291 (final judgment), even though the district court had deferred determination of the restitution amount to a later date. *See Manrique v. United States*, 137 S. Ct. 1266, 1272–73 (2017) (citing *Dolan v. United States*, 560 U.S. 605, 617–18 (2010)). The government contends, however, that defendants' appellate objections to the amount of restitution imposed must be dismissed due to their failure to file notice of appeal challenging their amended judgments ordering restitution. Not strictly a matter of jurisdiction, this issue is addressed below in Part III.D.2.

## III. ANALYSIS

### A. Evidence of Jackson's Prior Convictions

Prior to trial, Jackson filed a motion in limine, asking the court to prohibit the government from introducing evidence of his prior convictions and the SEC judgment against him. Jackson asserted that such evidence had no relevance to the charged offenses, would not be

admissible for a legitimate purpose under Fed. R. Evid. 404(b) ("such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"), and therefore would be introduced only for the inadmissible purpose of proving his character to show that the charged conduct was in conformity therewith. Jackson also asked the court to prohibit the use of such evidence to impeach him, should he testify. He argued that because his convictions and release from prison occurred more than ten years ago, such evidence would not be admissible under Fed. R. Evid. 609(b), because its probative value would not substantially outweigh its prejudicial effect.

The government opposed the motion, contending the evidence of his prior convictions and the SEC judgment was not Rule 404(b) evidence at all. Rather, it was said to be "direct proof'" of the crimes with which Jackson and his coconspirators were charged, i.e., evidence of material information that Jackson and the others fraudulently failed to disclose to investors. Further, the government argued the evidence represented proper impeachment material whose probative value outweighed its potential for unfair prejudice. Notably, Jackson did not file a reply brief in support of his motion.

Without a hearing, the district court denied the motion in limine in a summary docket-entry order, essentially adopting the government's position:

> Order [non-document] as to Kenneth Jackson: Defendant's Motion in Limine To Exclude Any Evidence Relating To Other Crimes, Wrongs, Or Bad Acts is DENIED. The Court agrees with the Government that a 404(b) analysis is unnecessary. The prior convictions at issue are direct proof of the charged scheme. The Court also agrees that the SEC injunction and judgment are inextricably intertwined with the money laundering charges. The Court reserves ruling on whether the prior convictions are proper impeachment. Judge Patricia A. Gaughan on 2/16/16.

N.D. Ohio No. 1:15-cr-263, docket entry order, 2/16/16. The district court thus declined to evaluate admissibility under Rule 404(b), the basis asserted by Jackson in his motion in limine, because it determined that the evidence was proffered for admissible purposes. Jackson did not move for reconsideration. All four defendants challenge this ruling on various grounds as an abuse of discretion.

### 1. *Rule 404(b)*

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2).

The standards under which the district court's Rule 404(b) ruling is assessed are summarized as follows:

> The admission of evidence under Rule 404(b)—like the admission of all evidence—implicates discretionary judgments under Rules 401 (relevance) and 403 (probative value versus unfair prejudice); it also involves a question of fact and a question of law. *See United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000). . . .

> First, we review for clear error whether there is a sufficient factual basis for the occurrence of the "bad act" that is being proffered as evidence (and challenged pursuant to 404(b)). *United States v. Murphy*, 241 F.3d 447, 450 (6th Cir. 2001). Second, we determine de novo whether the evidence was proffered for an admissible purpose. *Id.* Third, we review for an abuse of discretion whether the probative value of the proffered evidence is substantially outweighed by any undue prejudice that will result from its admittance. *Id.*

> "A factual finding is clearly erroneous when a court, on reviewing the evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Seymour*, 739 F.3d 923, 928 (6th Cir. 2014) (internal quotation marks omitted). The district court's decision to view the

evidence in a particular way, however, does not constitute clear error simply because there are other reasonable interpretations of that same evidence that may seem preferable to the reviewing court. *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 331 (6th Cir. 2002).

A district court has abused its discretion when its decision rests on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts. *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014). A clear error of judgment, which occurs where the position taken is without sound justification, also constitutes an abuse of discretion. *Id.*

*United States v. Gibbs*, 797 F.3d 416, 421–22 (6th Cir. 2015).

### 2. *"Direct Proof"*

As to the first step in the Rule 404(b) analysis—the factual basis for the prior convictions and SEC judgment—there is no dispute. The second step asks us to identify the admissible purpose for which the prior bad acts evidence was proffered. The district court determined that evidence of Jackson's prior convictions was proffered for the legitimate purpose of proving an element of the charged offenses, i.e., that Jackson and his co-defendants knew of material information that they withheld from investors in order to carry out their scheme to defraud. The court further held that the evidence of the SEC judgment was "inextricably intertwined" with the money laundering charges. The court thus accepted the government's argument that the admissibility of such "direct evidence" of the offenses charged is not subject to scrutiny under Rule 404(b).

The government relied, and relies, principally on an unpublished Second Circuit decision for this proposition, *United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013). In *Stitsky*, the court held that the "defendants' prior convictions were direct proof of the charged scheme to defraud" because they represented facts that the defendants failed to disclose "that investors would have considered material in making their investment decisions." *Id.* at 106.

The government argues that Sixth Circuit law is consistent with *Stitsky*, recognizing that "[*r*]*es gestae* evidence, also described as 'background' or 'intrinsic' evidence, is 'an exception' to the Rule 404(b) bar on propensity evidence." *Gibbs*, 797 F.3d at 423 (citing *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013)). In *Adams*, the court stated:

> Background evidence "consists of those other acts that are inextricably intertwined with the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id*. Concerned with the potential for abuse of background evidence as a means to circumvent Rule 404(b), we have recognized "severe limitations as to 'temporal proximity, causal relationship, or spatial connections' among the other acts and the charged offense." *United States v. Clay*, 667 F.3d 689, 698 (6th Cir. 2012) (quoting *Hardy*, 228 F.3d at 749).

*Adams*, 722 F.3d at 810.

On appeal, Jackson does not contest the fact of the convictions or the fact of the SEC judgment. Nor does he dispute the allegation, on which some of the charges against him are based, that he failed to disclose these matters to investors unless asked. Jackson does not challenge the district court's conclusion that the evidence is "direct proof" of the charged offenses. Co-defendant DeCiancio, however, contends Jackson's prior convictions should not have been considered direct evidence of a material omission for purposes of the fraud charges. This, he says, is because there was no affirmative legal duty to disclose the prior convictions. This argument was not raised in Jackson's motion in limine and appears not to have been raised below. It is thus properly reviewed only for plain error.[3]

---

[3] Jackson's brief in support of his motion in limine includes one sentence alluding to the *possibility* that the government might assert a direct-evidence justification for introduction of the prior-convictions evidence. If such an argument were made, Jackson hypothesized, it might be based on the notion that he had an affirmative duty to disclose the convictions, a duty he said is unsupported by case law or statutory law. R. 47, Motion in Limine at 4–5, Page ID 267–68. The

We may grant plain-error relief only if four requirements are met: (1) there must be a legal error; (2) the error must be clear; (3) the error must have affected the appellant's substantial rights; and (4) the error must have seriously affected the fairness, integrity, or public reputation of the proceedings. *United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)). A conviction should be reversed under plain-error review only in exceptional circumstances, such that the trial judge would be deemed derelict in having countenanced the unobjected-to conduct. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011).

DeCiancio argues that the government has not identified any statute or rule that establishes a duty to disclose Jackson's 1992 convictions. Absent a duty to disclose, the argument goes, defendants' alleged failure to disclose Jackson's convictions cannot be deemed a material omission, and it therefore follows that evidence of the convictions had little, if any, probative value as "direct proof." In the securities fraud context, in particular, he argues, there can be no culpability for silence absent a duty to disclose. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015).

---

statement anticipates an argument not then before the court and registers Jackson's objection. But Jackson's motion in limine, apart from this lone sentence, was based on Rule 404(b).

After the government responded as Jackson had anticipated it might, citing case law authority for its position that the prior-convictions information was material and should have been disclosed, Jackson filed no reply brief. After Jackson's motion in limine based on Rule 404(b) was denied, Jackson did not move for reconsideration. The argument was thus not developed in the district court. Nor has Jackson asserted it on appeal.

In other words, the argument alluded to in one sentence below was mentioned only in a perfunctory manner and never fully developed in legal argumentation—until DeCiancio developed it in his appeal. Under Sixth Circuit law, such an unpreserved claim is deemed forfeited (i.e., reviewed only for plain error) unless manifest injustice would otherwise result. *See United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008). Here, as explained below, DeCiancio has failed to show remediable plain error or manifest injustice.

In the Sixth Circuit, in the mail and wire fraud context, a false assertion or omission is material if it "would have affected a reasonable person's actions in the situation." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003); *see also United States v. Birnie*, 193 F. App'x 528, 534 (6th Cir. 2006). Similarly, in the securities fraud context, the materiality requirement is satisfied if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). It follows that the "materiality" of the withheld information does not depend strictly on the existence of a duty to disclose that has been codified by statute or prescribed by regulation. Rather, materiality is a more fluid concept, dependent on the totality of the circumstances, viewed from an objective perspective. *See United States v. Bravata*, 636 F. App'x 277, 283 (6th Cir. 2016) (materiality requirement deemed satisfied if fraudulent scheme is shown to "be credible enough to deceive persons of ordinary prudence and comprehension"); *United States v. Jamieson*, 427 F.3d 394, 414–16 (6th Cir. 2005) (same; finding no error in failure to give "duty to disclose" instruction in relation to fraud by material omission).

Moreover, our sister circuits have held that a failure to disclose prior convictions can amount to a fraudulent omission of material fact. In addition to the Second Circuit in *Stitsky*, the Eleventh Circuit has also held that evidence of a defendant's undisclosed twelve-year-old convictions was "material" and properly admitted in trial. *United States v. Bachynsky*, 415 F. App'x 167, 172 (11th Cir. 2011). The *Bachynsky* court expressly rejected the argument, here made by DeCiancio, that there could be no duty to disclose because no regulation required disclosure of convictions as old as his. *Id.* at 173. According to the court, under Rule 10b-5,

"[t]he duty to disclose 'is a general one and arises whenever a disclosed statement would be misleading in the absence of the disclos[ure] of [additional] material facts needed to make it *not* misleading.'" *Id*. at 172 (alterations in original) (quoting *S.E.C. v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996)). The *Bachynsky* court held that because the defendant held himself out as a legitimate businessman while soliciting investments, he had a duty to disclose his prior convictions. *Id.* Invoking the standard established by the Supreme Court in *Basic*, the court held the evidence was material because it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 172 (quoting *Basic*, 485 U.S. at 231–32). *See also United States v. Lewis,* 774 F.3d 837, 843 (5th Cir. 2014) (recognizing that nondisclosure of prior securities fraud conviction was material omission); *S.E.C. v. Johnson*, 174 F. App'x 111, 115–16 (3d Cir. 2006) (no abuse of discretion in admitting evidence of undisclosed conviction as material omission). Substantiating its position that Jackson's prior fraud-related convictions were "material" under this "reasonable person" standard, the government cites the trial testimony of numerous investors to the effect that knowing of Jackson's criminal past would have influenced their decisions.

DeCiancio contends these case law authorities are distinguishable. His arguments are not convincing. But even if the district court's ruling was not compelled by the above authorities and even if the court were deemed to have erred by admitting evidence of Jackson's convictions as direct proof, the above authorities strongly support the conclusion that the "error" was not so clear that the district court should have excluded the evidence despite four defendants' failure to object to it on this basis. Under plain-error review, DeCiancio cannot prevail on this argument.[4]

---

[4] DeCiancio also argues that the district court's denial of the motion in limine had the effect of imposing a never previously recognized duty to disclose all prior convictions to potential investors. Citing *Dale v. Haeberlin*, 878 F.2d 930, 934 (6th Cir. 1989), he argues that

### 3. *"Inextricably Intertwined"*

Although Jackson does not challenge the direct-proof rationale for admission of his prior convictions evidence, he does object to the district court's characterization of the SEC judgment as "inextricably intertwined" with the money laundering charges. Jackson concedes that if the SEC judgment were inextricably intertwined, Rule 404(b) analysis would be unnecessary, citing *United States v. Rios*, 830 F.3d 403, 426 (6th Cir. 2016). But he maintains that the SEC judgment, requiring him to disgorge $1.8 million stemming from the Ponzi scheme that resulted in his criminal convictions, was too remote in time to be considered inextricably intertwined. DeCiancio joins in this argument. Not having been raised below, the argument is reviewable only for plain error.

Granted, to minimize potential for abuse of background evidence in circumvention of Rule 404(b), we have recognized the need for limitations as to "temporal proximity, causal relationship, or spatial connections" between the other acts and the charged offense. *Adams*, 722 F.3d at 810. But the district court accepted the government's argument that the SEC judgment, still outstanding at the time of the alleged scheme to defraud, was inextricably intertwined insofar as it served as a "prelude" to the charged money laundering, "completing the story" thereof. There is no error in this conclusion. *See Gibbs*, 797 F.3d at 423; *Adams*,

---

such a reinterpretation of the law amounts to a creation of a new "rule" punishing him for conduct that was not punishable at the time of his actions, an *ex post facto* violation.

Again, this argument was not made to the district court and is reviewable only for plain error, a standard DeCiancio cannot meet. At its root, the argument is based on a mischaracterization of the district court's ruling. The district court did not create and enforce a new "rule" that punishes DeCiancio. It ruled that Jackson had not made a persuasive case for exclusion of evidence that he had been convicted of other fraud offenses and was subject to a still-pending disgorgement judgment. The court merely ruled that the government was permitted, subject to other rules of evidence, to introduce evidence the jury could consider in determining whether the materiality elements of the charged offenses were established beyond a reasonable doubt. Again, the district court's failure to recognize this "*ex post facto* problem" was not plain error.

722 F.3d at 810; *Clay*, 667 F.3d at 697–98; *Hardy*, 228 F.3d at 748. Indeed, though the SEC injunction and disgorgement order were entered years earlier, the fact that the obligations imposed on Jackson were still pending at the time of the alleged scheme rendered the order "inextricably intertwined," as in "*res gestae* or background evidence." *Adams*, 722 F.3d at 810; *Clay*, 667 F.3d at 697. Again, in this respect, too, there was no abuse of discretion in the district court's denial of the motion in limine, much less remediable plain error.[5]

### 4. *Rule 403 Balancing*

Jackson emphasizes that even if his prior convictions were properly deemed relevant as direct proof, obviating the need for a Rule 404(b) assessment, the district court still abused its discretion by allowing the government to "bludgeon" him with repeated references to the evidence without ever undertaking the required Rule 403 "probative value versus prejudicial effect" analysis. Jackson's co-defendants join him in this argument.

Defendants' arguments are based principally on the number of times the government made or elicited reference to the prior convictions during the trial. They catalogue 80 instances when government counsel referred to Jackson's prior convictions, and 44 times when defense counsel were constrained to refer to them. Obviously, when the district court denied Jackson's motion in limine in its summary docket entry order, it ruled merely that the reason asserted for excluding the evidence was not meritorious and the evidence was admissible. The only argument before the court at that time was Jackson's contention that, because the government could not articulate a proper purpose for introducing the evidence under Rule 404(b), the

---

[5] DeCiancio also asks the court to reject the "inextricably intertwined" exception to the Rule 404(b) bar altogether, citing several cases from other jurisdictions that have called it into question. Yet, even if the exception may be subject to abuse in some cases, the district court's denial of Jackson's pre-trial motion in limine is not an example of abuse. This case poses no opportunity or need for us to depart from our clearly established precedent.

prejudicial effect of the evidence would necessarily outweigh its probative value. But the district court correctly accepted the government's argument that the prior convictions represented direct evidence of the charged offenses exempt from the Rule 404(b) bar on propensity evidence. *Gibbs*, 797 F.3d at 423. Jackson did not file a reply brief opposing the government's position, so the district court was not presented with any argument that the direct-evidence purpose of the prior-convictions evidence was outweighed by its potential for unfair prejudice. Nor was the court obliged to anticipate, pre-trial, that the government would use the evidence in a manner that defendants would find objectionable *post-trial*.

Defendants contend that even if the prior-convictions evidence was properly deemed *res gestae* evidence exempt from Rule 404(b) analysis, the court was still obliged to ensure the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015). The district court is thus said to have erred by failing to address Rule 403 balancing in its denial of the motion in limine. Had the court engaged in such balancing, defendants argue, it would have concluded that the minimal probative value of the evidence was far outweighed by its tendency to prejudice the defendants in the eyes of the jury due to the government's excessive references.

Again, the argument was not made to the district court in relation to use of the evidence as direct proof of the crimes charged. Nor was the present argument made to the district court, i.e., that unfair prejudice inhered in the sheer number of references to Jackson's convictions. Defendants have not identified any instance when they objected and raised this specific concern to the district court's attention during trial—i.e., that the cumulative effect of the repeated references to Jackson's criminal history was unfairly prejudicial. Again, plain-error review applies.

The government maintains that the references to Jackson's prior convictions were not excessive. The many references are said to have been due to the nature of the charges (which required the government to prove the materiality of the information concealed or omitted), the number of persons victimized by defendants' scheme (579), and the length of the trial (almost four weeks). These facts are indisputable.

Thus, Jackson's criminal history was repeatedly referred to throughout the trial in furtherance of the government's burden of proving that defendants had failed to disclose material information to investors. It was information whose nondisclosure the jury could reasonably have found was "material." The information was probative of an essential element of the charged offenses and was, in like measure, prejudicial to defendants' defense. Defendants have not demonstrated, however, that the court's pre-trial refusal to exclude all mention of the prior convictions resulted in *unfair* prejudice to any defendant. Nor have they shown that they objected during trial to the repeated references to this probative evidence as unfairly prejudicial. Defendants have failed to show that the denial of the motion in limine was an abuse of discretion or that the ensuing introduction and repeated references to the evidence amounted to plain error.

### 5. *Jury Instruction*

Insofar as the district court denied Jackson's motion in limine, it opened the door to evidence that could potentially have been used by the jury for an improper purpose. One way of guarding against such potential for misuse is by instructing the jury on the limited use for which the evidence was admitted. Accordingly, Jackson requested such a limiting instruction and the district court included it, practically verbatim, in its charge to the jury:

> You have heard that in 1992, Defendant Kenneth Jackson was convicted of crimes. These earlier convictions were brought to your attention relative to the Government's allegations that the Defendant made material misrepresentations or material omissions regarding the existence of those convictions. They cannot be

used for any other purpose. It is not evidence that he is guilty of the crime that he is on trial for now.

R. 283, Trial Tr. Vol. 18 at 4231–32, Page ID 8970–71. Although Jackson did not object to the instruction, but rather requested it, he now contends that it is confusing and misleading.[6] He contends the purpose of the prior-convictions evidence identified in the instruction—to permit the jury to consider whether a defendant "made *material misrepresentations and* material omissions regarding the existence of those convictions"—is too broad. That is, it is said to be broader than the purpose for which the court had denied Jackson's motion in limine—i.e., permitting introduction of the prior-convictions evidence as direct proof that defendants, by failing to disclose the convictions to investors, made a material omission. This language, Jackson contends, is ambiguous enough to have permitted the jury to consider evidence of his having made material misrepresentations in the past as evidence that he is guilty of having made material misrepresentations in relation to the charged crime. The ambiguity is exacerbated, he contends, by the instruction's inconsistent and "horribly confusing" use of the pronouns "they" and "it."

The legal accuracy of a jury instruction is ordinarily reviewed de novo. *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010). Here, however, the government contends Jackson did not merely forfeit review, but waived review, by virtue of having requested the very instruction that the court gave, which is generally consistent with Sixth Circuit Pattern Instruction 7.13. Under the "invited error doctrine," the government contends the court may take cognizance of error only if it would result in manifest injustice. *See United States v. Demmler*, 655 F.3d 451, 458–59 (6th Cir. 2011). Arguing there is no reason to believe the jury

---

[6] Not only did Jackson request the instruction, but his attorney expressly stated at the close of the jury charge that he appreciated the court's having given his requested instruction. R. 283, Trial Tr. Vol. 18 at 4242–43, Page ID 8981–82.

misunderstood the instruction, the government contends that any technical ambiguity or inartfulness of the instruction is not shown to have resulted in manifest injustice, and the court should decline to review Jackson's claim of error. *See id.*; *United States v. Meade*, 677 F. App'x 959, 976 (6th Cir. 2017) (declining to review challenge to instruction).

Jackson's attempts to distinguish *Demmler* and avoid the invited error doctrine are not persuasive. But even if Jackson were deemed not to have *waived* objection, but merely to have failed to preserve objection, our review would be for plain error only. *United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012). Under plain-error review, the applicable analysis and the outcome are practically the same as if the objection had been waived. "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Id.* at 528 (quoting *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010)). "Reversal is only proper if the instructions, viewed as a whole, were confusing, misleading, or prejudicial, and the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Id.* (internal quotation marks and citations omitted).

Jackson has not met the requirements for relief under plain-error review. First, a natural reading of the instruction—despite its rough edges—yields the intended (and entirely proper) meaning, i.e., that the evidence of Jackson's prior convictions was introduced in relation to the government's allegation that he made material misrepresentations or material omissions regarding the existence of those convictions, and the evidence was not to be used for any other purpose. Any imagined ambiguity arising from a technical or strained reading of the instruction's language falls short of impugning the integrity of the trial or suggesting a miscarriage of justice.

## 6. *Impeachment*

Jackson also challenges the district court's allowance of the prior convictions to impeach his testimony. When it denied the pre-trial motion in limine, the court refrained from ruling on the impeachment use of the convictions. In trial, the court allowed the government to use Jackson's prior convictions in cross-examining him. After the government's counsel had been questioning Jackson for some time, however, Jackson's attorney lodged an objection that led to a sidebar conference. R. 275, Trial Tr. Vol. 16 at 3562–64, Page ID 7887–89. The court clarified that it would permit questioning on the various convictions and whether Jackson believed they represented material information to prospective investors, but would not permit their use for impeachment and would not permit inquiry into the details of the convictions. *Id.* But before this sidebar conference clarification, Jackson contends the court had in fact allowed counsel to use the details of the prior misconduct to impeach. *Id.* at 3550–62, Page ID 7875–87. That is, before counsel objected, the court is said to have permitted impeachment use of these greater-than-ten-years-old convictions without undertaking a proper "probative value versus prejudicial effect" balancing, as required by Fed. R. Evid. 609(b)(1).

First of all, once Jackson's counsel objected, the district court issued a clarification—a clarification that he did not and does not object to. Prior to the objection, the allowance of the questioning is reviewable only for plain error. Review of these thirteen pages of questions and answers reveals examination of some conviction-related details—the sort of details into which the court did not permit inquiry after the sidebar clarification. But the gist of the questioning went to Jackson's understanding of the materiality of the information that he failed to disclose, not impeachment. Moreover, since the fact of the convictions had repeatedly been made part of the record during the government's case in chief, any prejudicial effect resulting from the few

details added in this short line of questioning, even if the court's countenancing of the questioning were deemed plain error, did not so adversely affect Jackson's substantial rights as to impugn the fairness and integrity of the trial. There is no reversible error here.

### 7. *Opening Statement*

Jackson also contends the prosecution made improper use of the prior convictions during its opening statement by mentioning his eight-year term of imprisonment and by inviting the jurors to identify with the victims. Jackson argues that mention of his imprisonment exceeded the scope of the permissible use of his prior convictions, as established by the court's ruling in denying the motion in limine. He cites *Johnson v. Bell*, 525 F.3d 466 (6th Cir. 2008), in support of his contention that "arguments that encourage juror identification with crime victims are improper." *Id.* at 484. Both abuses are said to have been designed to "poison the jury's mind" against Jackson.

To prevail on a claim of prosecutorial misconduct, it is not enough for Jackson to show that the prosecutor's comments were improper; he must establish that the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Wogenstahl v. Mitchell*, 668 F.3d 307, 327–28 (6th Cir. 2012). If the comments were improper, the court then considers whether they were so flagrant as to result in such fundamental unfairness as to warrant reversal. *United States v. Lawrence*, 735 F.3d 385, 431–32 (6th Cir. 2013). Four factors guide this determination of flagrancy: "'(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.'" *Id.* at 432 (quoting *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009)). Ordinarily, a claim of prosecutorial misconduct is

reviewed de novo, but where no objection was made during trial, the claim is reviewed for plain error. *Id.*

Jackson's argument deserves only short shrift. Even if both identified comments were deemed improper, neither could be deemed to be flagrant. The first improper comment, in its entirety, consisted of the following:

> The witnesses will tell you how defendants failed to disclose to investors information that would have been important for them to know in deciding whether to entrust $10 million of their money to the defendants, information such as the fact that Ken Jackson, the so-called R&D director of their operation, was really, really the one calling the shots, and that he had previously been convicted of securities fraud, aggravated theft, and perjury, *and sent to jail for eight years because of it.*

R. 243, Trial Tr. Vol. 1 at 15, Page ID 4293 (emphasis added). The comment regarding Jackson's imprisonment did not explicitly exceed the scope of the district court's limine ruling. The court's ruling did not define a permissible scope; it merely denied Jackson's motion to exclude prior-convictions evidence because it was relevant as direct proof. If the comment was improper at all, it was because of its gratuitous nature and its arguable tendency to taint the jury's objectivity from the outset of the trial. Yet, it was clearly an isolated comment of minimal significance. It was not flagrant and would only have been made *more* noticeable if counsel had objected and persuaded the court to give a limiting or cautionary instruction. The comment did not infect the trial with such unfairness as to require a new trial. Any impropriety did not amount to remediable plain error.

The second improper comment was no more offensive:

> The evidence will show that Ken Jackson and Bill Schureck owed a lot of money to a lot of people for these past endeavors. It will show that Ken Jackson still owed the SEC $1.8 million in relation to a prior securities fraud scheme, a multi-million dollar Ponzi scheme that landed him in jail for eight years, from 1992 to 1999, with those convictions for securities fraud, aggravated theft and

perjury. All the defendants knew about those crimes and knew about the debt, but not one of them told potential investors about them.

> *Still want to give your money to the defendants? Think at a minimum you're entitled to know these things before you decide to part with your money?*

*Id.* at 22–23, Page ID 4300–01 (emphasis added). Nominally, the highlighted comments may have crossed the line of propriety recognized in *Johnson v. Bell*. But the government argues the rhetorical questions had a proper purpose: they were designed to assist the jurors in identifying not with the victims, but with the objective "reasonable person" standard under which they would soon be asked to assess the materiality of Jackson's nondisclosure of the convictions. And in any event, the comments are clearly less flagrant than the improper comments addressed in *Johnson* which were nonetheless held *not* to be flagrant. Here, too, the comments did not amount to any fundamental unfairness cognizable under plain-error review.

### 8. *Cumulative Effect*

Finally, citing *Churn*, 800 F.3d at 780, Jackson and DeCiancio argue that even if none of the alleged improprieties regarding use of the prior-convictions evidence, standing alone, amounts to reversible error, their combined effect warrants reversal. *Churn* recognizes the hypothetical possibility that minor errors may combine to produce an unfair trial. Yet, despite having identified error in the trial court's evidentiary rulings, the *Churn* court denied cumulative-effect relief, because the alleged errors did not affect the defendant's substantial rights. *Id.* Here, defendants' argument is even weaker than the one rejected in *Churn*. Defendants have not shown *any* cognizable error. As the government argues, "the accumulation of non-errors cannot collectively amount to a violation of due process." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004).

**B. Sufficiency of the Evidence**

Two of the defendants, Donohue and Schureck, contend the jury's verdicts are not supported by sufficient evidence. Though such a challenge is reviewed de novo, to prevail, defendants must bear a "very heavy burden." *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016). Relief must be denied if the court finds that, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, the reviewing court does not reweigh the evidence, re-evaluate the credibility of the witnesses, or substitute its judgment for that of the jury. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011). Substantial and competent circumstantial evidence may suffice by itself, even without removing every reasonable hypothesis except that of guilt. *Id.*

**1.** *Schureck*

(a) *Conspiracy, Mail Fraud and Wire Fraud*

In relation to the charges that he participated in a conspiracy to commit mail fraud and wire fraud (18 U.S.C. § 1349), and committed the substantive mail fraud and wire fraud offenses (18 U.S.C. §§ 1341, 1343), Schureck contends the government failed to prove that he knowingly joined the conspiracy and failed to prove that he knowingly made any material misrepresentation.

To prove the conspiracy charge, the government was required to prove that two or more persons conspired, or agreed, to commit the crime of mail fraud or wire fraud and that defendant knowingly and voluntarily joined the conspiracy. *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014). "Circumstantial evidence that a reasonable person could interpret as showing

participation in a common plan may be used to establish the existence of a conspiracy agreement." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (quoting *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001)).

To prove mail fraud or wire fraud, the government was required to prove that defendant devised or willfully participated in a scheme to defraud, that he used the mails or an interstate wire communication in furtherance of the scheme, and that he intended to deprive the victim of money or property. *Rogers*, 769 F.3d at 377. *See also United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (recognizing that mail fraud and wire fraud offenses have the same elements apart from the means of communication used to carry out the scheme). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005).

The jury was instructed in accordance with these standards and in a manner consistent with the Sixth Circuit Pattern Instructions. *See* R. 283, Trial Tr. Vol. 18 at 4201–03, Page ID 8940–42 (conspiracy); at 4207–09, Page ID 8946–48 (mail fraud); and at 4211–12, Page ID 8950–51 (wire fraud).

Schureck insists the government's proofs failed to meet the required elements. He acknowledges that he solicited money from investors to fund the FDA approval process, conveyed hope that their investments would be profitable, and transferred money received on behalf of MSS to his Schur Partnership. However, he insists the government's proofs failed to show that he acted knowingly and intentionally with intent to defraud. Insofar as some items of evidence showed that he made misrepresentations regarding the status of the FDA premarket approval process or the market-readiness of the Sharps Terminator, he insists that he made them

in good faith reliance on information received from Jackson. In response, the government contends that even if the evidence did not directly reveal Schureck's state of mind, the jury was presented ample circumstantial grounds on which to reasonably conclude that Schureck, as MSS President or CEO, had access to inside information that rendered his professed ignorance either false, unreasonable or unbelievable.

In relevant part, the jury was instructed as follows:

> The term false or fraudulent pretenses representations or promises means any false statements or assertions that concern a material aspect of the matter in question that were either known to be untrue when made or made with reckless indifference to their truth. They include actual direct false statements as well as half truth [sic] and the knowing concealment of material facts.
>
> An act is knowingly done if done voluntarily and intentionally and not because of mistake or some other innocent reason.
>
> A misrepresentation or concealment is "material" if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension.
>
> ****
>
> Consequently, it is sufficient that the Defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken.

R. 283, Trial Tr. Vol. 18 at 4208–09, Page ID 8947–48.

Viewing the evidence in the light most favorable to the government and in light of these instructions, and refraining from reweighing the evidence and re-evaluating credibility, it is apparent that a rational trier of fact could conclude that Schureck's participation in material misrepresentations was not a matter of innocent mistake, but was accompanied either by knowledge of their untruthfulness or by reckless indifference to whether they were truthful or

not. Even though the evidence does not remove every reasonable hypothesis except that of guilt, the jury verdicts are sufficiently supported by the evidence.

(b) *Securities Fraud*

Schureck's challenge to the sufficiency of the evidence supporting the jury's verdict on the securities fraud claim follows a similar course. To prove the securities fraud charge under 15 U.S.C. § 77q(a), the government was required to prove that Schureck participated in a fraudulent scheme to offer or sell a security through instruments of interstate commerce. *United States v. Speer*, 419 F. App'x 562, 568 (6th Cir. 2011). The statute identifies three unlawful actions:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

In this context, too, Schureck reiterates his argument that any misrepresentations he participated in were made in good faith reliance on information received from Jackson. Again, as explained above, there was record evidence on which a reasonable juror could reasonably choose to disbelieve Schureck or to conclude that his reliance on Jackson was unreasonable or even reckless.

(c) *Money Laundering*

Schureck also challenges the verdicts on the money laundering conspiracy charge, the money laundering charges, and the charge that he engaged in a monetary transaction in unlawfully derived property.

To prove money laundering conspiracy under a concealment theory, 18 U.S.C. § 1956(a)(1)(B)(i) and § 1956(h), the government had to prove that defendant conspired with another to violate the substantive provisions of the money laundering statute, i.e., to "conduct[ ] a financial transaction with criminal proceeds, with knowledge that the money was the proceeds of unlawful activity, and with knowledge that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the money." *United States v. Reed*, 264 F.3d 640, 650–51 (6th Cir. 2001). To convict a defendant of engaging in an unlawful monetary transaction under 18 U.S.C. § 1957, the government had to show that defendant: (1) knowingly engaged, or attempted to engage, in a monetary transaction; (2) knew that the funds involved in the transaction were criminally derived; (3) used criminally derived funds exceeding $10,000 in the transaction; and (4) used funds derived from specified unlawful activity. *United States v. Young*, 266 F.3d 468, 476 (6th Cir. 2001).

Schureck acknowledges that he transferred monies from the MSS account to the Schur Partnership account and used these monies to pay his own personal expenses and other obligations, but maintains he was legally entitled to these funds pursuant to the Assets Purchase Agreement. He also acknowledges that he transferred monies in the form of a loan from Schur Partnership to MSS. Further, he admits providing MSS checks to Jackson, which he believed were for legitimate business expenses. Yet, Schureck maintains the government failed to prove—as required to establish concealment money laundering—that any of these transactions

was animated by a purpose to conceal the nature of the illicit funds. *See United States v. Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010). He also argues the government failed to show that he *knew* transferred funds were derived from unlawful activity, as required to prove the unlawful-monetary-transaction charge.

The government cites circumstantial evidence consisting of numerous irregular monetary transactions, from which it contends, and we agree, the jury could reasonably infer the requisite animating purpose and knowledge. Our review of the record, viewed in the light most favorable to the government, confirms that the jury's verdicts on the money laundering charges are adequately supported.

(d) *False Statement*

Count 31 of the indictment charged Schureck with making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2). Five elements must be proved: "(1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of such statement; (4) relevance of such statement to the functioning of a federal department or agency; and (5) that the false statement was material." *United States v. Streets*, 401 F. App'x 81, 88 (6th Cir. 2010) (quoting *United States v. Hixon*, 987 F.2d 1261, 1266 (6th Cir. 1993)). Schureck contends the government failed to prove the allegedly false statements made by him to IRS Agent Matthew Miller were relevant to the functioning of a federal agency. He contends that Miller's answer, to the effect that Schureck's statements necessitated "additional investigation," is insufficient.

In response, the government argues that Schureck's argument invites the court to weigh the evidence and assess Miller's credibility, which we are not at liberty to do. Indeed, that "additional investigation" could be deemed to satisfy the fourth and fifth elements of the offense is borne out by the instruction given to the jury: "A material statement or representation is one

that has the natural tendency to influence, or was capable of influencing, a decision or function" of the federal agency. R. 283, Trial Tr. Vol. 18 at 4229, Page ID 8968. The evidence cited by the government is meager, but sufficient to satisfy the demands of our limited review.

### 2. *Donohue*

Donohue likewise contends the government presented insufficient evidence to support his convictions for conspiracy to commit mail fraud and wire fraud, for mail fraud and wire fraud, and for securities fraud. He maintains the government failed to show that he knowingly joined the conspiracy and failed to prove that he knowingly made any material misrepresentation. To the extent he participated in any communications that included misrepresentations regarding the status of the FDA approval process, he contends he was merely parroting information received from Jackson, who was undisputedly the responsible party. Donohue insists that he was merely a salaried employee, who did what he was told.

Yet, Donohue did not testify to tell his story and the government relies on circumstantial evidence from which it argues the jury could reasonably conclude that Donohue's professed naïveté was not believable. The government contends that, at a minimum, the evidence showed that Donohue deliberately ignored a high probability that communications he was participating in were part of an ongoing scheme to defraud and that he knowingly joined and participated in it. The record evidence is not conclusive, but viewed in the light most favorable to the government, it is sufficient to support the jury's verdicts.

### C. Denial of Motion for New Trial

After the conclusion of the trial and before the sentencing hearing, defendant Jackson moved for a new trial based on newly discovered evidence. Co-defendant Schureck joined in the motion, as did co-defendant Donohue. The asserted newly discovered evidence consisted of the

U.S. Patent and Trademark Office's issuance of a patent on the Sharps Terminator device, on May 3, 2016, the same day the proofs closed in the trial. Defendants' position was that issuance of the patent, based on design drawings that Jackson had created, served to rebut the government's theory that Jackson and co-defendants "were selling the rights to a piece of junk" and that MSS was a "scam business." The district court denied the motion. The court held, *inter alia*, that the evidence was "not material or is merely cumulative or impeaching," and that defendants' argument was "based on a mischaracterization of the government's theory of the case." R. 198, Opinion at 6, Page ID 4106. The court further concluded that defendants fell short of establishing that the evidence would likely produce an acquittal. Schureck challenges this ruling on appeal.

The court reviews the denial of a motion for new trial for abuse of discretion. *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006). To prevail on a motion for new trial based on newly discovered evidence, a defendant must establish that: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *Id*. (quoting *United States v. Glover,* 21 F.3d 133, 138 (6th Cir. 1994)).

In appealing the district court's ruling, Schureck simply reiterates the arguments rejected by the district court. These arguments fail to demonstrate that the district court abused its discretion. The district court summed up its conclusion that the new evidence was "not material" and was "impeaching at best" as follows:

> As set forth above, the thrust of the government's case revolved around false statements made to investors regarding the status of FDA approval and the marketability of the Sharps Terminator at the time the investments were made. The approval of certain designs by the USPTO or the FDA has no bearing on the

> truth or falsity of the statements made by defendants at the time those statements were made.

R. 198, Opinion at 8, Page ID 4108. In this, there is no abuse of discretion. The new evidence was not irrelevant, but was only tangentially related to the real issues, and was not so significant as to pose a likelihood of acquittal on any of the charges.

### D. Sentencing Issues

#### 1. *Loss Calculation*

In the sentencing hearings conducted on October 25, 2016, the court had to determine the amount of loss caused by defendants' scheme, to determine the base offense level under U.S.S.G. § 2B1.1. As a starting point, the court accepted the parties' acknowledgement that the monetary loss was in the amount of $9,244,080.61, resulting in an 18-level increase in each defendant's base offense level. The court then rejected defendants' arguments to reduce that amount for "credit against loss" under Guidelines § 2B1.1, Commentary Note 3(E)(ii), based on the value of investors' shares of MSS stock. The court rejected the argument for lack of evidence that the shares had any value at the time of sentencing. All four defendants contend this was error.

The sentences imposed by the district court, whether challenged on the basis of procedural or substantive unreasonableness, are reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Defendants' challenge to the court's loss calculation is a procedural challenge. The parties agree that our review of the loss calculation is guided by the standards enunciated in *United States v. Healy*, 553 F. App'x 560 (6th Cir. 2014):

> "[T]he district court is to determine the amount of loss [under U.S.S.G. § 2B1.1(b)(1)] by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010) (quoting *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006)). To show clear error, a defendant must show

the calculation "was not only inexact but outside the universe of acceptable computations." *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (quoting *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004)). In calculating the loss, the district court need only make a reasonable estimate. *McCarty*, 628 F.3d at 290. "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.* (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C) (2008)). For this reason, the district court's loss determination is entitled to appropriate deference. *Id.*

*Id.* at 564 (alterations in original).

The district court rejected defendants' argument that they were entitled to any credit under U.S.S.G. § 2B1.1, cmt. n. 3(E)(ii), which allows for credit against loss:

In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

The district court determined there was no evidence that any investor-victim had sold any of his or her shares of MSS stock. R. 278, Jackson Sent. Tr. at 7. Further, the court noted there was "no factual support demonstrating that the stock has any value as of this date." *Id.* Accordingly, the court found the application note not applicable.

Defendants do not quarrel with the finding that there was no evidence of fair market value at the time of sentencing, but they contend the government had the burden of proving amount of loss by preponderance of the evidence and the government presented no evidence to support a finding that the MSS shares still held by investors were worthless at the time of sentencing. In fact, they insist the record does include evidence demonstrating that the MSS shares did have *some* indeterminate value. This value is said to be evidenced by the license agreement under which Sharps Terminator, LLC, agreed to pay one-third of net profits from

sales of the Sharp Terminator to MSS and the FDA's February 2016 notice of premarket approval of the Sharps Terminator.

Disposition of defendants' argument is effectively controlled by *Healy*, where the court addressed the same issue in relation to restitution. The *Healy* court considered whether the defendant was entitled to a reduction in the amount of restitution based on the *potential future value* of his shares in the company, which he was ordered to disgorge. Citing *United States v. Elson*, 577 F.3d 713, 733–34 (6th Cir. 2009), the court held that the defendant had the burden of proving entitlement to such an offset; that the defendant had not shown the company had any cognizable value at the time of sentencing; and that an offset for potential future increase in value could be accounted for as a credit against restitution later when that value became determinate, not as a reduction in the amount of restitution ordered at the time of sentencing. *Healy*, 553 F. App'x at 569. *Healy*'s teaching has been followed in relation to restitution and analogous amount-of-loss calculation issues. *See United States v. Sizemore*, 850 F.3d 821, 828 (6th Cir. 2017) (regarding restitution amount, burden of proving offset rests with defendant); *United States v. Jackson*, 662 F. App'x 416, 426–27 (6th Cir. 2016) (deferring to district court's loss calculation and refusal to grant requested reduction); *United States v. Turner*, 615 F. App'x 264, 269 (6th Cir. 2015) (same).

Defendants have not shown that the district court's amount-of-loss calculation was "outside the universe of acceptable computations," *Martinez*, 588 F.3d at 326, and have thus failed to show clear error.

## 2. *Restitution*

(a) *Challenges Preserved?*

In the sentencing hearings conducted on October 25, 2016, the court held that all four defendants would be jointly and severally liable for restitution in an amount to be determined later, within ninety days. The court issued all four judgments of sentence on November 1, 2016, providing the "amount of restitution will be determined within 90 days." All four defendants timely appealed. The court then received supplemental submissions from the parties on the amount of restitution. The court issued its "restitution order" on January 5, 2017, overruling defendants' objections to the government's proposed amount of $9,825,917.41. This restitution amount was then incorporated into amended judgments issued on February 6, 2017. No defendant filed notice of appeal from his amended judgment.

There is no dispute that we have jurisdiction to decide defendants' challenges to their original judgments, which represent final appealable judgments under 18 U.S.C. § 3742(a) (final sentence) and 28 U.S.C. § 1291 (final judgment), even though the district court had deferred determination of the restitution amount to a later date. *See Manrique*, 137 S. Ct. at 1272–73. The government contends, however, that defendants' appellate objections to the restitution amount must be dismissed due to their failure to file notices of appeal challenging their amended judgments ordering restitution.

This is not, technically, a matter of jurisdiction. In *Manrique*, the Court refrained from deciding whether the filing of notice of appeal from an amended judgment imposing restitution is a jurisdictional requirement, but held the requirement "is at least a mandatory claim-processing rule." *Id.* at 1271. If the failure to meet a mandatory claim-processing requirement is properly

raised, the Court held, "the court's duty to dismiss the appeal [is] mandatory." *Id*. at 1272 (quoting *Eberhart v. United States*, 546 U.S. 12, 18 (2005)).

In response, defendants acknowledge *Manrique*, but point out that it was decided in April 2017, months after their amended judgments entered. They contend *Manrique*'s teaching should not be applied because the law of this circuit had previously held that a notice of appeal from an initial judgment "sprang forward" and conferred jurisdiction over an amended judgment, absent a showing of prejudice to the government. *See United States v. Stoian*, 2015 WL 5036366 at *1–2 (6th Cir. Aug. 12, 2015) (unpublished); *United States v. Malcolm*, 114 F.3d 1190, 1997 WL 311416 at *6 (6th Cir. 1997) (unpublished).

The Sixth Circuit authorities cited by defendants, albeit unpublished, do support their position. The *Stoian* court relevantly observed: "when all the parties understand that the judgment was not final, as here, we will 'not allow that substance to be defeated by, literally, a form.'" 2015 WL 5036366 at *2 (quoting *Malcolm*, 1997 WL 311416 at *5). Moreover, defendants' objections to restitution, apart from the specific amount, had been asserted at the time of sentencing and are preserved by their original notices of appeal. The government has not argued that it is prejudiced as a result of defendants' failure to file second notices of appeal. So, according to the Sixth Circuit precedent extant at the time of the amended judgments, all of defendants' appellate issues would be deemed properly before the court by virtue of their original timely-filed notices of appeal.

However, the *Manrique* Court observed that it had already been made clear in 2010 that "deferred restitution cases involve two appealable judgments, not one." *Manrique*, 137 S. Ct. at 1273 (citing *Dolan*, 560 U.S. at 618). The *Manrique* Court thus applied its holding retrospectively to dismiss appeal from an amended judgment establishing the restitution amount

that was issued on September 18, 2014. In the process, the Court rejected the two dissenting justices' preference for an "equitable" approach like that previously employed here in the Sixth Circuit. Subsequently, the Fourth Circuit has applied the rule of *Manrique* to dismiss an appeal from a restitution order where the restitution order had been entered after the defendant filed notice of appeal from the underlying sentence. *United States v. McNeil*, 707 F. App'x 764, 765 (4th Cir. 2017).

The law thus favors the government's position, but the equities are with the defendants. Yet, in our case, the outcome is the same by either way. That is, even if we were to refrain from enforcing the "mandatory" *Manrique* claim-processing rule to dismiss defendants' challenges to the amount of restitution, consideration of the merits would not result in relief anyway.

(b) *Restitution Amount*

In its restitution order, the district court explained that the $9,825,917.41 amount consists of two components:

> The first component consists of $9,193,653.75, which is the total amount of money that victims directly gave defendants to purchase shares of MMS stock, purchase distribution territories and prepaid inventory, and pay for sales training, as well as money provided as loans. The government's calculation includes credits for any loan repayment or dividend distribution. Defendants do not objection to this amount.

R. 249, Order at 2, Page ID 4516. While defendants did not object to the first component, they did object to the second component, $632,263.33, which consists of "'out of pocket' expenditures incurred in connection with purchasing stock or prepaid inventory, or expenses incurred in attempting to establish distribution of the Sharps Terminator." *Id.* The district court overruled defendants' objection to the second component, and defendants have renewed their objection on appeal, albeit in different form.

On appeal, defendants challenge that portion of the second component attributable to expenses incurred by Evolutions Enterprises, LLC, amounting to $449,020.91. Evolutions Enterprises was formed by four individuals (namely Andrew LaPointe, Dave Atkinson, Steve Roppolo, and Ralph Scumaci) in March 2011 to serve as a distributorship for the Sharps Terminator in eleven states in the Midwest. These individuals, through Evolutions Enterprises, invested funds and incurred expenses in reengineering the Sharps Terminator and preparing to manufacture it in Serbia and market it in the United States and Europe, once FDA approval was granted. In an argument not made below, Schureck and Donohue now contend that Evolutions Enterprises is not entitled to restitution because it has been dissolved since it sustained its losses.

The government contends the argument should be dismissed per *Manrique*, or, alternatively, should be reviewed only for plain error. The government contends defendants cannot show remediable plain error because they have cited no authority for the proposition that a corporate victim is no longer entitled to restitution after it has ceased to operate. Further, the government argues, although the principal purpose of restitution is to make victims whole, its purposes also include punishment. *See Elson*, 577 F.3d at 734. The government contends a defendant should not be allowed to avoid this "restitutionary punishment" because the losses his conduct inflicted were so severe as to cause the corporate victim's insolvency.

Under plain-error review, we find no grounds to disturb the judgment. Defendants have not demonstrated any error of law or fact, much less plain error that so adversely affects the integrity and public reputation of the proceeding as to warrant relief. We have no reason to question the competence of the U. S. Attorney to make fair distribution of restitution payments as they are received. If the successors in interest or the individuals who actually sustained the losses through Evolutions Enterprises as a result of defendants' fraud are unavailable or cannot

be ascertained, we are confident that the U.S. Attorney will make pro rata distribution of restitution payments to others of the numerous victims.

Defendants' only other objection to the restitution amount relates to the district court's refusal to reduce the amount based on the present value of MSS shares held by the victims. In reasoning paralleling that applied in its amount-of-loss calculation, the district court once again applied the teaching of *Healy*, 553 F. App'x at 569. Because the record was devoid of evidence of the value, if any, of MSS shares at the time of sentencing, the court concluded that defendants failed to carry their burden of establishing entitlement to any reduction in restitution. The court did not ignore defendants' argument that the Sharps Terminator might eventually become a profitable product, but concluded that speculation about future possibilities could not be taken into account in determining the restitution amount:

> Although I acknowledge that Sharps Terminator is now the subject of an issued patent and has received FDA approval, the government has represented that no sales have occurred to date.

> Therefore, for this Court to assign any value to these shares would be speculative at best. And this is especially so in that MSS no longer even owns the patent, and it appears that the only assets I can even consider is the right to any future, I'm going to call them, royalties.

> And the Sixth Circuit, I think, is quite instructive in *United States versus Healy*. That's 553 F. App'x 560, a 2014 case. Based on *Healy*, this Court finds that the shares as of today are worthless. And again, I cannot look at potential value. I have to look at value today.

R. 278, Jackson Sent. Tr. at 64.

Defendants' objection to this ruling was raised at the time of sentencing and was preserved through their original notices of appeal, notwithstanding their failure to file second notices of appeal from the amended judgments. But the objection is to no avail. Despite their

protestations that the shares have some indeterminate potential value that should be taken into account to prevent a future windfall to the victims, they fail to distinguish the present facts from those addressed in *Healy*. Defendants have thus failed to show that the district court clearly erred in finding the MSS shares had no cognizable value at the time of sentencing.

### 3. *Procedural Unreasonableness*

(a) *DeCiancio*

DeCiancio contends the district court committed procedural error when it adjusted his base offense level upward by eighteen levels based on the loss calculation attributable to the conspiratorial scheme without making particularized findings regarding his individual culpability and accountability for the loss under U.S.S.G. § 1B1.3(a)(1)(B).

At sentencing, DeCiancio argued that he was a minor role participant entitled to a two-level downward adjustment, which was granted. R. 279, DeCiancio Sent. Tr. at 5, Page ID 8422. He also argued that his minor role in the conspiracy warranted a downward departure from the Guidelines range, which was denied, as DeCiancio was sentenced to 70 months' imprisonment, at the low end of the range. He also objected to the conspiratorial loss amount of over $9 million, arguing that he had himself invested $750,000 in Needlezap and MSS, and had never received compensation from MSS. R. 183, Sent. Memorandum at 2, Page ID 3603. The district court gave this "objection" short shrift, along with others summarily stated in DeCiancio's sentencing memorandum, finding them to be factual in nature, and not well supported nor pertinent to calculation of the offense level. R. 279, Sent. Tr. at 4, Page ID 8421. *This*, ostensibly, is the objection that DeCiancio now argues merited more particularized findings. Yet, if the district court misunderstood the nature of DeCiancio's objection to the loss-amount

calculation—which would be understandable—this was the moment when counsel could be expected to speak up. He did not.

Further, when the district court made the *Bostic* inquiry at the close of the hearing, DeCiancio did not request clarified findings or object to the lack of particularized findings on the loss-amount calculation. Rather, he asked the court to note his objection to the denial of his request for a minimal-role downward departure. Now, on appeal, citing *United States v. Campbell*, 279 F.3d 392, 399–400 (6th Cir. 2002), DeCiancio contends the court was obliged to make more particularized findings as to (1) whether the loss amount was within the scope of his agreement in joining the conspiracy, and (2) whether that loss was foreseeable to him.

*This* § 1B1.3(a)(1)(B) objection is not an objection that was made below. We therefore review only for plain error and find that the district court cannot be deemed derelict in having countenanced the unobjected-to lack of particularized findings. *See Boyd*, 640 F.3d at 669. Moreover, even under abuse-of-discretion review, we would find the district court's response to DeCiancio's other minor-role arguments sufficient. As the government points out, the court, in explaining its two-level downward adjustment for DeCiancio's minor role in the conspiracy, recognized that he was not as culpable as Jackson and Schureck. Yet, the court considered the sentence sufficient but not greater than necessary because "Mr. DeCiancio did, in fact, make representations regarding FDA approval and, frankly, had the investors not heard that, the investors wouldn't have invested." R. 279, Sent. Tr. at 33–34, Page ID 8450–51. There is thus no reason to believe that the district court "missed" anything that adversely affected DeCiancio's substantive rights or the integrity of the proceeding. DeCiancio has not shown plain error or an abuse of discretion.

(b) *Donohue*

Donohue also challenges his sentence as procedurally unreasonable. He contends the court did not adequately explain why it increased his base offense level by two levels under U.S.S.G. § 2B1.1(b)(2)(A)(iii) for causing substantial financial hardship to one or more victims.[7] In fact, Donohue argues, the record reflects the court's determination that the scheme did *not* cause victims substantial financial hardship. *See* R. 278, Jackson Sent. Tr. at 11, Page ID 8358.

The government's response solves the mystery. At the beginning of Donohue's sentencing, the court explained this two-level adjustment by incorporating the reasons set forth during co-defendant Jackson's earlier sentencing hearing. R. 280, Donohue Sent. Tr. at 4, Page ID 8458. The reason then given for the two-level adjustment was that the offense clearly involved ten or more victims. R. 278, Jackson Sent. Tr. at 12, Page ID 8359. Under U.S.S.G. § 2B1.1(b)(2)(A)(i), a two-level increase is required if the offense involved 10 or more victims— irrespective of any substantial financial hardship. There is no dispute about the propriety of this basis for the adjustment.

### 4. *Substantive Unreasonableness*

(a) *Donohue*

Donohue contends his 46-month within-Guidelines-range prison sentence is substantively unreasonable because the court did not adequately explain its consideration of the factors prescribed at 18 U.S.C. § 3553(a). Donohue does not identify any factor that should have been given greater weight and resulted in a lesser sentence. In fact, the district court had given Donohue the "benefit of the doubt" in granting him a four-level downward adjustment for his "minimal role" in the conspiracy. R. 280, Donohue Sent. Tr. at 14–15, Page ID 8468–69.

---

[7] While Donohue cites § 2B1.1(b)(2)(C), the provision his argument is based on is actually § 2B1.1(b)(2)(A)(iii).

Donohue's sentence, at the very bottom of the advisory Guidelines range, is presumptively

reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc). Donohue has

not rebutted the presumption.

(b) *Schureck*

Schureck also challenges his 108-month prison sentence as substantively unreasonable.

In particular, he contends the court did not give due consideration to his age (82 years) and poor

health in fashioning an appropriate sentence. Again, because Schureck, too, was sentenced to a

prison term at the very low end of his advisory Guidelines range, the sentence enjoys a rebuttable

presumption that it is substantively reasonable.

The district court addressed Schureck's request for a variance as follows:

> I do, in fact, find the sentence to be sufficient but not greater than necessary to satisfy the purposes of sentencing.

> As I stated earlier, this is a major fraud that took money from good, trusting people. I agree with [AUSA] Ms. Lutzko, I am not going to take age and health into account because, frankly, sir, you were elderly and had these health issues when you committed the fraud.

> So I am not going to take those into consideration for purposes of the sentence.

R. 281, Schureck Sent. Tr. at 35–36, Page ID 8521–22. In agreeing with government counsel's

argument, the court essentially adopted the rationale it had just heard presented by Ms. Lutzko.

In relevant part:

> I would also just, finally, with respect to the comments that Mr. Schureck made, he said he doesn't like cheap shots. Wouldn't stand by cheap shots and he never cheated anyone out of a dime. But the evidence in this case was to the contrary.

> He pulled cheap shot after cheap shot after cheap shot to these investors. He stood and looked them in the eye and told them: "The FDA approval, we're

getting it next week. The FDA has been out. The FDA is – it's coming, it's here," and he did that year after year after year.

Those are cheap shots.

Your Honor, with respect to the comments by defense counsel, in particular with respect to issues of health and age, age here really is a double edged sword or it cuts in both factors.

Yes, Mr. Schureck is elderly. He also committed this crime while elderly, and he used his grandfatherly appearance and his elderly status to his advantage with these investors to convince them to give him their money.

With respect to his health, he was able to commit this crime and fly all over the country and even the world to get people on board while still suffering these same sort of issues.

And as Your Honor's well-aware, the Bureau of Prisons is equipped to deal with virtually any medical problem either in-house, or if they're not, they contract outside with outside medical providers.

Your Honor, this crime was not a youthful indiscretion. This was something that a person who had benefits through life, a stable life, chose to commit, and he chose to commit it as an elderly individual, and that shouldn't cut -- undercut the seriousness of his crime or the offense.

And, therefore, the government is seeking a significant term of imprisonment in this case.

*Id.* at 32–33, Page ID 8518–19.

In the face of this explanation, it is clear that Schureck's summary argument that the court did not adequately consider the § 3553(a) factors falls short of rebutting the presumption of reasonableness.

## IV. CONCLUSION

Having thus considered each of defendants' many claims of legal error, we find no justification for disturbing any of the judgments. All four judgments are therefore **AFFIRMED**.